Bennett *v.* Bennett.

CHARLES A. BENNETT and CHARLES A. BENNETT, junior, proponents,

*v.*

HUDSON BENNETT and SAMUEL L. BENNETT, caveators.

1. Any person capable of recollecting of what his property consists, and who by ties of blood or friendship have claims upon his bounty, and whose mind is sufficiently sound to enable him to know and to understand what dis-

Bennett *v.* Bennett.

position he wants made of his property after his death, is competent to make a valid will.

2. Undue influence consists in the exercise of sufficient control over the person, the validity of whose act is brought in question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.

3. But a person cannot be unduly influenced to do what it is his legal duty to do.

4. While the fact that the will was drawn and executed under the superintendence of a favored legatee is not sufficient of itself to invalidate the will, it is a matter which should excite the judicial mind to suspicious scrutiny, but in a case where it stands alone, without other concomitants, it must be laid aside as without significance.

5. Every person competent to make a will has a right to the aid of any person he may think proper to select, when he desires to put his testamentary wishes in form to have legal efficacy, and if he exercises this right without improper interference or control, though he selects the person he intends to make his principal beneficiary, that fact, in the absence of evidence showing an abuse of confidence, constitutes no reason why probate should be denied to his will.

6. No court has power to refuse probate to a will merely because the disposition the testator has made of his property by it appears to the court to be unreasonable or unjust, but in case where fraud is charged the court should scan with watchful care the relations of the testator with his principal beneficiary, prior to and at the time of the execution of the will, for the purpose of seeing whether they, in connection with the provisions of the will, tend to prove or disprove the charge of fraud.

7. Even if a will is drawn by the sole legatee, if it is made by a testator possessing adequate capacity, and it is shown that he knew its contents when he published it, and it appears to have been executed in the manner prescribed by the statute, it must, unless evidence is produced showing that it is the product of fraud, be admitted to probate.

On application for probate.

*Mr. Frank P. McDermott* and *Mr. E. W. Arrowsmith,* for the proponents.

*Mr. Samuel C. Cowart, Mr. John S. Voorhees* and *Mr. William H. Vredenburgh,* for the caveators.

THE VICE-ORDINARY.

The question in dispute in this case is whether or not a writing purporting to be the will of Henry Bennett, deceased, is his will

and as such entitled to be admitted to probate.  This writing bears date the 15th day of March, 1889, and the testator died in August, 1892.  He was in his eighty-second year when he died and within a day of being seventy-eight years old when he signed this paper.  He died a bachelor, leaving as his nearest next of kin two brothers and thirteen nephews and nieces.  His nephews and nieces were the children of two deceased brothers and two deceased sisters.  He belonged to a family of seven children, five sons and two daughters.  Two daughters and two sons died before him, leaving children.  He left property consisting of both real and personal estate worth about $25,000.  By the writing on trial he gives about two-fifths of his estate to his nephew Charles A. Bennett, junior.  Charles drew the writing and superintended its execution.  Next after the gift to Charles a gift of electric light and gas stocks, worth about $500, is made to Charles' father, a brother of the testator.  The residue of his estate, with the exception of the chattels in his dwelling and barn, he directs to be divided into six equal shares, and he gives one share to each of his surviving brothers, three other shares are given, *per stirpes*, to the children of one of his deceased sisters and his two deceased brothers, and the remaining share or one-sixth is given to two of the four children of his other deceased sister.  The only next of kin excluded by the writing who would take if no will existed are two sons of one of his deceased sisters, and the only person who takes under the writing who would not take if there was no will is his nephew Charles A. Bennett, junior.  This is in substance the disposition the writing makes of the decedent's estate.

That the writing was executed in strict compliance with the requirements of the statute is not disputed, but its admission to probate is resisted on two grounds—*first*, it is said that when it was made the testator did not possess sufficient capacity to make a valid will; and, *second*, it is charged that the writing is the product of fraud.

In attempting to establish the first ground the caveators have proved, that when the testator was a lad he was thrown or fell from a horse and fractured his skull, and that subsequently, to relieve his brain from the pressure thus produced, a small piece

of his skull was removed, and a silver plate put in its place; he·
afterwards, however, learned the tailor's trade and carried on the·
business of a tailor for some years; he was always slow of
speech; one witness says that he was slow to apprehend and·
appeared to think with very great effort and to express himself·
with very great effort; while another says that he thought he was·
weak minded because he lacked perception and did not quickly·
discover when he was the subject of ridicule or jest; and a third·
says that he thought his mind was a little below the average in·
quickness of perception; he was never able to talk fluently; for·
many years, it is shown, that in telling a story or narrating an·
incident he would sometimes pause and hesitate, as if searching·
for a word, but, until a few years before his death, he was always·
able to find the word he wanted, and would, when he found it,·
proceed with his narrative; as he advanced in years this infirm-·
ity increased, and during the last four or five years of his life a
few instances are proved when, either because his memory failed·
to give him the word he wanted or the continuity of his thought
became broken, he was unable to finish what he commenced to·
say; he was a religious man and formerly frequently prayed in·
public; his prayers, during the last years of his life, are de-·
scribed as somewhat incoherent; one witness says that, during
this period, in praying in public, he would start off quite fluently,·
and then would pause and hesitate, and when he resumed would
give expression to a thought different from that which he was·
attempting to utter when he ceased speaking; this witness also·
says that the last time he heard him attempt to pray in public·
he commenced and, after uttering a few sentences, he paused for a·
long time, and then sat.down abruptly, and that from that time·
forth he never again attempted to pray in public; another wit-
ness says that he has been present on more than one occasion·
when the testator, after commencing a prayer, would stop, appa-
rently for the want of words to express his thought, and, after·
hesitating for a while, would sit down before the sentence he was·
attempting to utter was completed, or, in the language of the·
witness, "right in the midst of a sentence." It is also shown·
that about the time he executed the writing in question his car-

riage and walk indicated a failure of physical vigor; his step became less elastic and his gait slower, and during the last two years of his life, some of the witnesses say, he sometimes shuffled when he walked; he also repeated his stories to the same person, manifesting the same zest in their repetition that he did in their first narration. Both prior and subsequent to the execution of his will, it is shown that his recollection of localities was somewhat faded and confused, and that on two occasions he confounded one place with another, both of which he had lived near and known well all his life; he thought he was at one place when in fact he was at another, more than three miles distant from the place where he supposed he was. And his brother Hudson, one the caveators, swears that more than three years before the writing in question was executed the testator, after complaining to him of his head, said: " I am getting so I ain't fit for business; I tell you I am demented."

This summary, I believe, embraces every fact to be found in the evidence possessing the slightest weight or force in proof of incapacity.

The evidence offered to prove capacity shows, that prior to the execution of the will the testator was a director of three corporations—a fire insurance company, a gas company and an electric light company—and that he continued in these offices, discharging the duties of each, up to the time of his death; so far as appears, none of his fellow-directors or any stockholder of either corporation ever doubted his competency or fitness; he retained control of all his business affairs up to the time of his death and managed them with prudence and sagacity; on the 19th day of April, 1889, a little over a month after the execution of his will, he negotiated a contract for having his buildings painted and reduced the contract to writing; the part he took in this transaction, as described by one of the persons with whom the contract was made, shows not only that at that time he had a sound mind and knew how to make a good bargain, but also that he knew how to guard and protect his rights. The contract was put in writing at his suggestion, and he wrote it himself without assistance. One of the parties to the contract says that he mentioned

everything he wanted painted as he wrote the contract. In the spring of 1892 he negotiated the sale of a lot of land in Freehold to the gas company of which he was a director. When the negotiations were opened he asked $1,500 for the lot; it was worth, as the evidence shows, about $1,000; he knew the company needed it and could not get along very well without it, as it was one of a very few lots that were available for its purposes; at last he agreed to take $1,400, and the lot was conveyed to the company at that price. His book of account, extending from 1872 up to the time of his death, is in evidence. The entries up to the time of his death are nearly all in his own handwriting, and the book appears to contain a full record of all his business transactions, showing not only the state of his account with his tenants and other persons with whom he had had dealings, but also the times when and the amounts paid by him for taxes and insurance premiums. The entries made subsequent to the date of the will—and they are numerous—are precisely of the same character as those made before, and evince the same business intelligence, skill and care. The will now before the court is a second draft. When the first draft was read to the testator, its draughtsman swears that he asked what was to become of his chattels, and that he was told that under his will, as it was then written, they would have to be sold. He at once said that he did not want that done, and that his will in that respect must be changed; that he wanted his chattels divided, but as he was not then prepared to state just how they should be divided, he directed that his will should be so drawn as to give them to his executors, and he would subsequently give directions as to how they should be divided. The draughtsman also swears that, in reading the first draft, when he read the clause giving one-sixth of the residue to the four children of one of his deceased sisters, the testator directed him to stop, and then said that he scarcely knew his sister's two sons and had not seen them for a long time, and guessed they did not care any more for him than he did for them, and thereupon directed that their names should be struck out and that the whole of that one-sixth should be given to his sister's two daughters. The draughtsman also says that

Bennett v. Bennett.

when the testator instructed how to draw his will, he said he wanted to give his brother Charles a little more than he did the others, and then said, "Let's see," and there paused, and that during the pause he said, "There is the bank stock, the electric light stock and the gas stock," and that the testator then said, "Give him the gas stock and the electric light stock." The bank stock was worth over $900, while the other two together were worth about $500. On the evening when the will was executed, it is proved that the paper now before the court was handed to the testator, in the presence of the subscribing witnesses, by its draughtsman, with direction to read it and see that it was all right, and that the testator, after being alone with the paper in an adjoining room for twenty minutes, as estimated by one witness, and for five to eight, as estimated by another, said that the paper was all right, and that immediately thereafter the subscribing witnesses went into the room where the testator was, either at his request or that of the draughtsman, and that the testator then signed and published the paper as his will. These are the main facts proved to show capacity.

Now, whether this evidence is considered as a whole or separately, and thus placed in contrast, it does not seem to me, according to the standard of testamentary capacity firmly established in this state, that there can be the least doubt that the testator, at the time he executed the writing in question, was competent to make a valid will. The evidence shows, I think, beyond all doubt, that at that time he possessed a mind and memory sufficient to enable him to know and to understand, thoroughly and perfectly, the business in which he was engaged. He knew of what his property consisted, who were bound to him by ties of blood, and, therefore, the natural objects of his bounty, and how he wanted his property distributed after his death. A knowledge of these things constitutes, as I understand the law, perfect testamentary capacity. By our law the right of testamentary disposition may be exercised by a person of very moderate capacity. He must have a sound and disposing mind and memory, but his memory may be very imperfect; he may not be able, at all times, to recollect the names, the persons or

the families of those with whom he has been intimately acquainted; he may at times ask idle questions and repeat those which had been asked and answered; he may not have sufficient strength of memory and vigor of intellect to digest all parts of a contract, and yet be competent to make a will. If he is capable of recollecting of what his property consists, and who, either in consequence of ties of blood or friendship, should be the objects of his bounty, and has a mind sufficiently sound to enable him to know and to understand what disposition he wants made of his property after his death, he is competent to make a valid will. This is, in substance, the definition of testamentary capacity given by Mr. Justice Washington, in *Stevens* v. *Vancleve, 4 Wash. C. C. 263, 269,* and which the courts of this state have, in every instance in which the question has been raised, adopted as the standard by which such capacity should be measured and determined. The proofs offered in support of the allegation of incapacity standing alone, and unopposed by any conflicting evidence, fail, in my judgment, to make a case which would justify a denial of probate. Few rights are more valuable and important than the right of testamentary disposition. To the aged, whose vigor is abating, and who, in consequence of the infirmities of old age, are compelled to look to others for many of the things that render life pleasant and comfortable, it is more precious than any other, and should for that reason be guarded by the courts with a jealous care and upheld with the utmost firmness.

The charge of fraud is made in two forms. First, it is said, that it may be that the writing before the court is not the will executed by the testator, but that the whole of it, except the last page, containing the names of the testator and the subscribing witnesses, has, since its publication, been fraudulently substituted. This charge has no other foundation or support than that Charles A. Bennett, junior, has had an opportunity to commit such a wrong. The will consists of two sheets, with writing on five pages, and the two sheets had been bound together by eyelets before the paper was handed to the testator to read on the evening of its execution. Immediately after its execution, the testator directed Charles to take the will and to keep it, and from

that time it remained in his possession until after the testator's burial. So that it is true that Charles had an opportunity to commit a fraud of the kind that it is insinuated he may have committed, but there is absolutely nothing in the proofs, nor in Charles' conduct or character, which is sufficient, in my judgment, to raise a passing suspicion, even in a mind naturally distrustful, that the writing is not now, in all respects, just as it was when it was executed, or that since its execution it has, in any way, been tampered with, changed or altered. This charge must, therefore, be dismissed as utterly groundless.

The other charge is that the will is the product of undue influence, and Charles A. Bennett, junior, is the person who is accused of having exerted the subjugating power. Stated generally, undue influence consists in the destruction of free agency, and whether this be accomplished by a strong or slight exercise of power, or by force or peaceful means, is wholly immaterial, for if it appears to have been sufficient to destroy free agency, and to have constrained the person, whose act is brought in judgment, to do what was against his will, and what he would not have done if he had been left free, it constitutes what the law calls undue influence. The main, if not the only, evidence relied on to establish the truth of this charge, are the facts that Charles stood to the testator in a confidential relation, having for about ten years been his attorney; that he drew and superintended the execution of the will, under which, if it is admitted to probate, he will take nearly one-half of the testator's whole estate, and that he persisted in doing so after his father had advised him, that, as he was to be the principal beneficiary, it would be prudent to have the will drawn by some other person. By the civil law a will written by a person in favor of himself was void, but this was never the rule of the common law. By the common law the mere presence of this fact was never sufficient of itself to invalidate the will. The utmost effect it was ever entitled to, in any case, was to create a suspicion against the validity of the will of more or less weight, according to the circumstances of each particular case. In some of no weight at all, as where the gift to the draughtsman is small in amount or of

trifling value, while in others, especially when coupled with other evidence of fraud or imposition, of very great weight, as, for example, where the will is drawn by the principal legatee when the testator is very infirm and his capacity is doubtful, and it is executed, by the procurement of the principal legatee, when the testator is dying; "but," as was said by Baron Parke, speaking for the judicial committee of the privy council, in *Barry* v. *Butlin, 6 Eng. Eccl. 417, 419 (1 Curt. 637)*, "in no case amounting to more than a circumstance of suspicion, demanding the vigilant care and circumspection of the court in investigating the case, and calling upon it not to grant probate without full and entire satisfaction that the instrument expresses the real intentions of the decedent." The doctrine just stated is the established law of this state. Mr. Justice Dixon, in pronouncing the unanimous judgment of the court of errors and appeals, in *Rusling* v. *Rusling, 9 Stew. Eq. 603, 609*, said that while the fact that one of the favored legatees had drawn the will was not sufficient of itself to invalidate the will, it certainly was a matter which should excite the judicial mind to suspicious scrutiny, but in a case where it stood substantially alone, without other concomitants, as it did in that case, the suspicion should be laid aside, and the will be admitted to probate.

No matter if the will is drawn by the principal, or even sole, legatee, if it is made by a testator possessing adequate capacity, and it is shown that he knew its contents when he published it, and it appears to have been executed in the manner prescribed by the statute, the court must, in obedience to the law of the land, uphold it as the will of the testator and admit it to probate, unless satisfactory evidence is produced showing that it is the product of fraud. Every person competent to make a will has a right, as incident to the right of testamentary disposition, when he desires to put his testamentary wishes in legal form, to the aid of any person he may think proper to select—his right in this respect is absolute—and when he exercises this right according to his own mind, free from all improper control, though he selects the person he intends to make his principal beneficiary, that fact, standing alone and in the absence of any evidence tend-

Bennett *v.* Bennett.

ing to show an abuse of confidence, constitutes no reason what-
ever why probate of his will should be refused. This right was
distinctly recognized by the court of errors and appeals in *Wad-
dington* v. *Buzby, 18 Stew. Eq. 173.*

There is nothing strange or unnatural about the selection made
by the testator in this case; on the contrary, it is obvious that
he did just what almost any person in his situation in life, with
his feelings and knowledge, would have done under like circum-
stances. Charles was his favorite nephew. He had a stronger
love for him than for any other person. This is shown not only
by the fact that he gave him nearly one-half of his whole estate,
but by a long course of conduct. When Charles was admitted
to the bar in 1878, the testator at once manifested an interest in
his success by giving him what little legal business he had to do,
and he continued to do so up to the time of his death; at the
time he made up his mind to have a will drawn, Charles had
transacted his legal business for him for about ten years, and he
had evidently transacted it in a manner to satisfy and please his
uncle; the testator resided but a short distance from Charles'
office, and visited him there almost daily; his intercourse with
Charles, for years prior to the time when he made his will, ap-
pears to have been more frequent, his intimacy with him closer
and his affection for him stronger than for any other person.
This selection, therefore, of Charles as the draughtsman of his
will was perfectly natural; the selection of any other person, in
view of the circumstances just stated, would have been so con-
trary to the ordinary course of such events as to have provoked
both surprise and suspicion.

While no court has power to refuse probate to a will because
the disposition the testator has made of his property by it
appears to the court to be unreasonable or unjust, for the very
obvious reason that his right to make a will necessarily embraces
the right to make any disposition of his property that his feelings
or his judgment may approve, and for the additional reason that
the testator, in deciding how his property should be distributed,
may have been controlled by secret affections or hate, or by
hidden motives and purposes, which, if known and understood

by the court as they were known and understood by him, would make a disposition which in the absence of such knowledge appears unreasonable and unjust, appear to be perfectly reasonable and just; still, in a case of this kind, where the principal beneficiary, who is also the draughtsman of the will, is charged with fraud, a careful and thorough consideration of the case demands that the positions of the testator and his main beneficiary towards each other and their relations prior to and at the time of the execution of the will should be scanned with watchful care. And, looking at this case from this point of view, the facts and circumstances above narrated go very far, as it appears to me, to demonstrate that the testator's gift to Charles was the spontaneous expression of his heart and mind. There can be no doubt at all that this is so if the evidence of Charles is believed. His evidence appears to me to be worthy of full credit. His conduct on the witness' stand was that of a candid and truthful witness. He was put to the test of a rigorous and searching examination without anything being elicited which raised the least doubt as to the substantial truthfulness of his evidence, and but a single fact was disclosed which casts the least discredit on him as a man. He admits that on one occasion, in answering an impertinent question, he told a falsehood. He did so under the pressure of the juncture of these circumstances: On the 1st of April, 1892, he made a settlement for the testator, with the testator's brother Hudson, of a claim which the testator had held for many years; after the settlement was completed, Hudson asked if the testator had ever made a will, and Charles, deeming the question to be impertinent, and looking upon the information sought as a professional secret, and not being able on the instant to frame an answer which, while truthful, would not, in effect, answer the question, replied, "Not that I know of." His answer, as he admitted on the witness stand, was a naked falsehood. His admission serves, however, rather to strengthen than to weaken my confidence in the reliability of his testimony. It requires, I believe, a stronger love of truth and a sterner courage for an upright man to confess a fact which soils his reputation and impugns his honor than it does to tell a truth which simply affects injuri-

ously his property rights. The first brings shame and disgrace, while the last merely puts his property in peril. Accepting the evidence of Charles as true, as I think must be done, the fact is fully established that the writing before the court as the will of Henry Bennett, deceased, is in all its parts the free, spontaneous and voluntary expression of his heart and mind.

But a single other fact will be adverted to. When the will was executed the land devised to Charles was subject to a mortgage of $2,500. The mortgage stood as collateral to the testator's own bond. He was primarily liable for the debt. The testator, acting through Charles, paid this debt in the spring of 1892, and had the mortgage canceled. He did so, as appears, of his own volition, without persuasion or suggestion. Charles admits that, although he knew for some time before the payment was made that the testator intended to make it, he at no time informed or instructed the testator as to the effect the payment would have on the land which the will devised to him. He says they never had any conversation on the subject. Charles' omission in this respect, it is contended with apparent sincerity, furnishes evidence that his conduct towards the testator, not only in 1892, when the mortgage was paid, but also in 1889, when the will was drawn and executed, was inspired and controlled by a fraudulent purpose. This contention, in my judgment, is utterly without substance, being scarcely specious in its logic. When the mortgage was paid, the mortgaged premises were still the property of the testator, and although he had made a devise of them, his will, until his death, remained ambulatory, subject to both change and revocation. In paying the mortgage he simply did what it was his legal duty to do. If Charles, by importunity or threats, had constrained him, against his will, to pay this debt, he would have done nothing wrong. A man cannot be improperly or unduly influenced to do what it is his legal duty to do. Every debtor who pays under the stress of judicial process, acts under coercion, and does what is against his will. But, in addition, as the debt was the personal debt of the testator, for which he was primarily liable, it is clear that, if it had remained unextinguished at the time of his death, Charles, as the devisee

Bennett v. Bennett.

of the mortgaged premises, would have had a right, according to a well settled principle of law, to have had the testator's personal estate applied to its payment.   With respect to this debt, the testator did in his lifetime just precisely what the law would have done after his death.

As the conclusion of the whole matter, my judgment is, that nothing whatever has been shown which raises a substantial doubt that the writing in question is the true last will of the testator.