713 A.2d 576

IN THE MATTER OF THE ESTATE OF
MORRIS REISEN, DECEASED.

Superior Court of New Jersey
Chancery Division
Probate Part
Essex County

Decided January 13, 1998.

*Allen C.B. Horsley* and *Lynn Menschenfreund,* for petitioner, Diana Reisen (*LeBoeuf, Lamb, Greene & MacRae, L.L.P.*, attorneys).

*Amy R. Reisen,* for Estate of Morris Reisen (*Freundlich, McClear, Reisen, L.L.P.*, attorneys).

HIGGINS CASS, J.S.C. (ret. temporarily assigned on recall).

This matter is before the court on the application of petitioner for an award of counsel fees and costs in connection with the litigation in the above-captioned matter.

## PROCEDURAL HISTORY

Pursuant to *R.* 4:85–1 the petitioner, Diana Reisen, (hereinafter Diana) individually and on behalf of her son Nathaniel Reisen, brought action to set aside the probate of the Last Will and Testament of Morris Reisen, deceased, said will having been executed November 2, 1995 (hereinafter the 1995 will) and to substitute therefore the document executed July 4, 1991, together with a codicil to that will executed in August, 1994 (hereinafter collectively the 1991 will).

Morris Reisen died on December 10, 1995 leaving a probate estate in excess of $3,000,000. His wife, Elizabeth (hereinafter Elizabeth) was the named executrix and trustee under both the wills and she qualified as executrix and trustee under the 1995 will on January 10, 1996. Diana, the estranged wife of the Reisens' son David, (hereinafter David) brought the action, on the grounds of undue influence and lack of testamentary capacity, to set aside the 1995 will and probate the 1991 will. Though a trustee under the 1991 will, Diana herself was not a beneficiary under either will. She sought to protect the rights of her disabled son, Nathaniel, and to serve as guardian ad litem.

The 1991 will contained several important provisions to benefit Nathaniel, as a child of David. They included the following:

1. Following Elizabeth's demise, the 1991 Will provides that the two trusts created for her benefit under Articles Sixth and Seventh are to be divided into eight (8) continuing trusts for the benefit of Morris and Elizabeth's four children, that is, two each for Jane, Elizabeth, Harriet and Diana's husband, David. The trustees of these continuing trusts are authorized to pay or apply principal of each of the children's Article Seventh Trust as they

determine necessary to provide for the health, comfortable support, maintenance and education of such child *or that child's children,* as well as for any expenses incurred by the child, *or that child's children* because of illness, operation, physical or mental infirmity or other emergency. The Article Seventh Trust provided specifically that distributions may be made for Nathaniel's benefit during David's life.

2. The 1991 Will provided that David, like his three siblings, retained the power to appoint, by his will, the principal of the two continuing trusts for his benefit under the Articles Sixth and Seventh Trusts of the Will to a class limited to *his* issue and, to avoid the generation-skipping transfer tax with respect to the Article Seventh Trust, his creditors.

3. Under the 1991 Will if David fails to exercise his power of appointment over the Article Sixth and Article Seventh Trusts established for his benefit, the principal of both trusts are divided into three equal shares, one for each of David and Diana's children, Nathaniel, and his non-disabled siblings, Alexander and Vanessa, such share to be held in a separate continuing trust for each child's benefit. While the trusts established for Alexander and Vanessa would terminate at age twenty-one pursuant to Article Ninth of the 1991 Will, Nathaniel's trust would continue for his lifetime.

Three weeks before the death of Morris, and after the divorce action between Diana and David had been commenced, Morris executed a new will which substantially changed the provisions which had benefitted Nathaniel. The changes were as follows:

1. An elimination of the authorization to the Trustees under the Article Seventh Trust for David to distribute corpus for Nathaniel's benefit, restricting that authority to distribute income and principal only to David, thus, entirely divesting Nathaniel's present beneficial interest under the 1991 Will.

2. Altering David's powers of appointment under the trusts established for his benefit to allow him to appoint the corpus of

each trust during his life and also to significantly expand the class of individuals whom David may appoint to any one or more of the *issue of his parents*. Under the 1995 Will, Nathaniel would become one of *ten* (10) potential recipients (aside from creditors), rather than one of *three* together with his two siblings.

3. Altering the provisions in default of David's exercise of his powers of appointment over the trusts so that the shares for Vanessa and Alexander are divided into separate inter vivos trusts for their individual benefit but Nathaniel's one-third share is not held in a separate trust for his individual benefit but instead is distributed to an inter vivos trust for the benefit of Vanessa, Alexander and Nathaniel. Thus Nathaniel under the 1995 Will was to share his one-third contingent remainder interest with his siblings, consequently substantially reducing the contingent remainder interest which Nathaniel was granted in the 1991 Will.

4. Under the 1995 Will, Diana was eliminated as a co-trustee for Nathaniel under all trust provisions.

Since Diana had been eliminated as a trustee under the 1995 will she had standing to bring this action. Moreover, since Allen C.B. Horsley (hereinafter Horsley) of the Boston office of the firm was representing Diana in connection with her divorce action, she asked for his admission *pro hac vice* to avoid duplication of effort.

Opposition to Diana's complaint and request for admission of Horsley *pro hac vice* as also a cross motion to dismiss Diana's complaint was filed and the matter came before me for preliminary hearing on September 6, 1996. At that time I granted the petitioner's application for Horsley's admission *pro hac vice*, appointed Diana as guardian *ad litem* for Nathaniel and denied the Estate's motion to dismiss petitioner's complaint.

As the parties wished to begin negotiations to try to settle the case, I stayed the matter to October 15, 1996, and then following a conference call of October 28, referred it to our Early Settlement Panel and Samuel Saiber, eminent counsel, succeeded in effectuating a settlement between the parties in December, 1996. Howev-

er, reduction of the terms of settlement to writing had to be further fleshed out and the Stipulation of Settlement was not signed until May 1, 1997.

By the terms of the settlement, the probate of the 1995 will was to be set aside and the 1991 will admitted in its place. During the administration of the estate and of the trusts for Elizabeth and David, year-end brokerage statements, 1099's and K–1's federal and state income tax returns and lists of asset distributions and expenses will be provided to Diana. She remains as guardian *ad litem* of Nathaniel. Diana could apply for reasonable attorneys' fees to be paid from the estate.

A motion was then filed seeking approval of Diana's counsel fees and costs. Opposition to the amount sought was filed by the estate, both sides submitted memoranda to the court, Horsley submitted a supplemental and more detailed certification of services rendered. I heard oral argument in July 1997, requested and received certain additional information and then reserved decision.

## APPLICABLE LAW

Although the general policy of New Jersey jurisprudence is that every litigant is to bear his or her own attorneys' fees and costs, exceptions have been carved out by the *Rules of Court* for specific situations. *R.* 4:42–9. Among these exceptions is that embodied in *R.* 4:42–9(a)(3) which states:

> (a) Actions in Which Fee Is Allowable. No fee for legal services shall be allowed in the taxed costs or otherwise, except. . . .
>
> (3) In a probate action, if probate is refused, the court may make an allowance to be paid out of the estate of the decedent. If probate is granted, and it shall appear that the contestant had reasonable cause for contesting the validity of the will or codicil, the court may make an allowance to the proponent and the contestant, to be paid out of the estate.

In such instances an affidavit of services in compliance with *R.* 4:42–9(b) is required. This section reads in part as follows:

> (b) Affidavit of Service. Except in tax and mortgage foreclosure actions, all applications for the allowance of fees shall be supported by an affidavit of services addressing the factors enumerated by RPC 1.5(a). The affidavit shall also include

a recitation of other factors pertinent in the evaluation of the services rendered, the amount of the allowance applied for, and itemization of disbursements for which reimbursement is sought. If the court is requested to consider the rendition of paraprofessional services in making a fee allowance, the affidavit shall include a detailed statement of the time spent and services rendered by paraprofessionals, a summary of the paraprofessional's qualification and the attorney's billing rate for paraprofessional services to clients generally....

In examining a counsel fee request, there are certain guidelines established for the measurement of counsel fees. These guidelines were first outlined in the case of *In re Bloomer*, 37 *N.J.Super.* 85, 117 *A.*2d 17 (App.Div.1955), where the court set forth the following criteria to be analyzed:

1) the amount of the estate and the amount thereof in dispute or jeopardy as to which professional services were made necessary; 2) the nature and extent of the jeopardy or risk involved; 3) the nature, extent and difficulty of the service rendered; 4) the experience and legal knowledge required and the skill, diligence, ability and judgment shown; 5) the time necessarily spent by the attorney in the performance of his services; 6) the results obtained; 7) the benefits or advantages resulting to the estate, and their importance; 8) any special circumstances including the standing of the attorney for integrity and skill; and 9) the overhead expense to which the attorney has been put. In any case, the counsel fee allowed should never exceed reasonable compensation for the service rendered the estate.

[*Id.* at 94, 117 *A.*2d 17]

Furthermore, *R.P.C.* 1.5(a) provides:

A lawyer's fees shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following: 1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; 2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; 3) the fee customarily charged in the locality for similar legal services; 4) the amount involved and the results obtained; 5) the time limitations imposed by the client or by the circumstances; 6) the nature and length of the professional relationship with the client; 7) the experience, reputation, and ability of the lawyer or lawyers performing the services; 8) whether the fee is fixed or contingent.

New Jersey law is settled with regards to actually determining the reasonableness of attorney's fees. *In re Trust of Brown*, 213 *N.J.Super.* 489, 517 *A.*2d 893 (Law Div.1986). The *Brown* court's method is to calculate 1) the basic, reasonable rate for ordinary probate work and 2) to adjust it upwards or downwards when other factors suggested by the rules and cases are present. *Id.* at 501, 517 *A.*2d 893. The *Brown* court reached this conclusion by

analogy to fee applications made under federal civil rights statutes, where a "lodestar" calculation is used in determining a reasonable fee.

> Generally, simpler and more straightforward approach in determining the reasonableness of attorneys' fees has evolved... The most useful starting point for determining the amount of a reasonable fee noted by the Supreme Court itself, *Hensley v. Eckerhart*, 461 *U.S.* 424 at 433, 103 *S.Ct.* 1933, 76 *L.Ed.*2d 40 (1983), is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This arithmetic result or "lodestar" may then be adjusted upward or downward to reflect any of those factors articulated in *Johnson v. Georgia Highway Express Inc. supra*, and any other considerations that are deemed relevant by the court in the exercise of its sound discretion. . . .
>
> [*Id.* at 500, 517 *A.*2d 893, citing to *Johnson v. Georgia Hwy. Express*, 488 *F.*2d 714 (5th Cir.1974).]

*See also Rendine v. Pantzer*, 141 *N.J.* 292, 337, 661 *A.*2d 1202 (1995); *H.I.P. v. K. Hovnanian*, 291 *N.J.Super.* 144, 157, 676 *A.*2d 1166 (Law Div.1996).

As the Court stated in *Argila v. Argila*, 256 *N.J.Super.* 484, 492, 607 *A.*2d 675 (App.Div.1992):

> In determining the reasonableness of any fee award, "[t]he initial focus in the calculus is appropriately directed to the time expended in pursuing the litigation." *Singer v. State*, 95 *N.J.* 487, 499, 472 *A.*2d 138, *cert. denied*, 469 *U.S.* 832, 105 *S.Ct.* 121, 83 *L.Ed.*2d 64 (1984). However, "time expended is *only* one of the factors to be considered." *Swanson v. Swanson*, 48 *Ohio App.*2d 85, 91, 2 *O.O.*3d 65, 69, 355 *N.E.*2d 894, 899 (1976); *see Mayer v. Mayer, supra*, 180 *N.J.Super.* at 169–70, 434 *A.*2d 614... As Judge Pressler comments, "[t]he purpose of the amendment [to our fee provision] was to provide a more accurate catalogue of the factors to be considered by the court in fixing the fee and to deemphasize the factor of the attorney's time spent, which is in itself often an unreliable guide but too often overemphasized by the court." Pressler, *Current N.J. Court Rules*, Comment 3 on *R.* 4:42–9(b) (1992) at 1011; *cf. In re Trust of Brown*, 213 *N.J.Super.* 489, 493, 495, 517 *A.*2d 893 (Law Div.1986).
>
> [*Id.* at 492, 517 *A.*2d 893].

### THE FEES REQUESTED

The firm of LeBoeuf, Lamb, Greene & MacRae has requested counsel fees to be paid by the estate in the sum of $94,081.25 and costs and disbursements of $5,967.62, for a total of $100,048.87. In support of their application a certification of legal services dated

June 16, 1997 and a supplemental certification dated July 21, 1997 were submitted to the court.[1]

Opposition by the estate focused on the following issues:

a) the contention that no fees should be paid to Diana from the estate as there was no benefit to the estate from the litigation and the action was but part and parcel of Diana's matrimonial litigation against her husband, David;

b) the contention that excessive hours were spent on this file and that many of said hours were either unnecessary or duplicative, the same work being done by several lawyers;

c) the contention that the rates charged by some of the attorneys were not reasonable.

d) the contention that the disbursements were not detailed and, in any event, excessive.

The estate had also contended that the petitioner's first certification did not comply with the requirements of either *R.* 4:42–9(b) nor *R.P.C.* 1.5a, but with the exception of paralegal and law clerk charges, which are being summarily set aside, the supplemental certification met the requirements of both rules.

The first issue raised by the estate seeks a denial of any fees to Diana. As earlier noted, one of the exceptions under R. 4:42–9 to the general rule that litigants bear their own fees is where there is a contest over the probate of the will. (See 4:42–9(a)(3) *supra* ). Certainly, here there was a contest over the probate of the 1995 will, and, in this court's view, the petitioner

---

1 While in the supplemental certification Horsley states that the billing for May 1997, was not included in the total amount set forth in the first certification, analysis of the amounts in both certifications reflects that the May billing was included.

At the same time Horsley stated that there should be a deduction of five hours for time incorrectly billed by him and estimated additional time in the month of June 1997, of approximately fourteen hours for himself, three hours for Stern and six hours for Menschenfreund, fees of $4,340, $975 and $1170, respectively, and a net total of 5,010.

had reasonable cause to bring the action to protect the interests of Nathaniel and to seek the setting aside of the 1995 will and its replacement by the 1991 will. The fact that the action benefitted only Nathaniel has no relevance here, precisely because the matter was a will contest. *Cf. In re Sugarman,* 191 *N.J.Super.* 385, 466 *A.*2d 1322 (Law Div.1983). The court here may make allowances for fees to both the proponent and the contestant.

Dealing, however, with the issue of excessive hours is quite another matter. Over 400 hours were spent by a total of ten different attorneys in the Newark, New York and Boston offices. Contrast the approximately 100 hours spent by the attorneys for the estate. This for a case which settled within *four* months of the preliminary hearing and without discovery.

I have carefully analyzed the hours spent by each of the attorneys in petitioner's law firm, as well as the rates charged. They are as follows:

| Office | Attorney | No. of Hours | Rate | Total |
|--------|----------|--------------|------|-------|
| Boston | Horsley | 113.6 | | $33,989.00 |
| | | (81.8 | $295 | |
| | | 31.8 | 310) | |
| New York | Stern | 66.75 | 325 | 21,693.75 |
| Newark | Menschenfreund | 96.5 | 195 | 18,817.50 |
| Newark | Kalm | 89 | 110 | 9,790.00 |
| Newark | Dittmar | 16.75 | 245 | 4,103.75 |
| New York | DePledge | 24.25 | 130 | 3,152.50 |
| New York | Butler | 13.25 | 195 | 2,583.75 |
| New York | Petitt | 5.25 | 270 | 1,417.50 |
| New York | Frank | .25 | 325 | 81.25 |
| New York | Griggs | .25 | 195 | 48.75 |
| | | 425.85 | | $95,677.75 |

Additionally, a law clerk in the Boston office, Paula Minella, spent a total of forty hours at $100 per hour reviewing the two wills, researching New Jersey probate law and drafting the original order to show cause, while the hours of several paralegals were also billed, for a total over all of $6,525.25.

If one considers the hours spent in three discrete time periods, the attorneys spent approximately 140 hours from June through

August 1996, almost 200 hours between September 1 and December 31, 1996 and another 85 hours between January 1 and June 30, 1997. During the first two time periods a total of eight attorneys and in the last time period, five attorneys worked on the file.

A number of factors should be borne in mind. First, after the court's rulings on September 6, 1996, the estate's attorney immediately offered to withdraw the 1995 will and probate the 1991 will in its place. Instead of accepting the offer, the petitioner then sought to have an independent (corporate) co-trustee appointed, contrary to the provisions of either will. Further she sought an accounting of the estate.

Secondly, there appears to the court to have been an extraordinary amount of time devoted to research, much of it seemingly duplicative or unnecessary. The time of attorneys Petitt (5.25 hours), Kalm (87 hours), De Pledge (24.75 hours) and Butler (13.25 hours), appears to have been devoted almost entirely to research; of Menschenfreund's hours (96.5), she too expended a substantial portion of her time supervising research and also participating in it. Stern, the trusts and estates partner in the New York office, also spent numerous hours analyzing the wills and researching or supervising research into certain trust principles and income or estate tax consequences.

Thirdly, there were numerous intra-office conferences, some involving three, four and five attorneys. It further appears that correspondence to opposing counsel or even the court required approvals from various attorneys and sometimes the client, herself, who is a Harvard Law School graduate The review, e.g., of one letter from counsel, Amy Reisen, to the court in April 1997, as to why there had been a delay in forwarding the settlement agreement, and response thereto (one page) involved three attorneys and the petitioner and a total of approximately 3.0 hours. (Reisen's time for the letter .3 hour). Or contrast the number of hours of the petitioner's law firm for April 1997, 35.5 hours, with that of the estate's attorneys, 4.2 hours.

As to the questions of undue influence, lack of testamentary capacity, standing of the petitioner to bring suit and admission *pro hac vice*, why was so much research, including that of the law clerk in Boston, who spent forty hours, done outside of the Newark office, when there were extremely competent New Jersey counsel who dealt with every issue involved?

The problem I see is the inefficiency generated by the use of numerous attorneys in various offices in a multi-state firm, all of whom have to be constantly updated as to process, research, negotiations, etc. This was not a terribly complicated matter. The changes in the 1995 will were not complex, though they did result in certain generation skipping tax consequences. What the petitioner ultimately achieved could have been finalized by one or two face to face conferences to thrash out the terms of the settlement agreement, once it had been agreed upon in principle at the mediation session. Approximately seventy-five additional hours were not needed.

Moreover, there was a certain amount of foot dragging and failure to negotiate in good faith in the fall of 1996. Most of the communication between September and December was intra-office, instead of with counsel for the estate.

The third contention of the estate is as to the rate charged by three of the petitioner's attorneys—Horsley, Stern and Dittmar. The supplemental certification of Horsley, in accordance with *R.P.C.* 1.5(a) sets forth the background and expertise of each of these attorneys and represents that their hourly rates are standard fees charged for similar legal services in the locale where each practices, Boston, New York and Newark. This court is, of course, familiar with the fees charged by probate counsel in the metropolitan northern New Jersey area and can take judicial notice thereof. Attorneys whose practice is primarily out-of-state, and who are admitted *pro hac vice* (as Horsley) or, while members of the New Jersey Bar (as Stern) function primarily in the firm's New York office, must expect that the court will look to the fees charged in this locale to determine the reasonableness of the rate.

Thus Dittmar seeks allowance at the rate of $245 per hour, which the court finds to be, in the circumstances, a reasonable rate. Similarly, the court finds that the reasonable rate per hour for Horsley and Stern would be $250 per hour. The rates for various associates were within appropriate levels.

For all of the foregoing reasons the court finds that the total number of hours expended was far in excess of what was reasonably required to resolve this matter. As the Supreme Court stated in *Szczepanski v. Newcomb Med. Center,* 141 *N.J.* 346, 366, 661 *A.*2d 1232 (1995)

> Courts reviewing fee allowances should assess what legal services **reasonably competent counsel would consider as required to** vindicate the protected legal or constitutional rights. Neither the tortoise nor the hare should be the model for compensation.
>
> [*Id.* at 366, 661 *A.*2d 1232]

■ The court recognizes that the petitioner would, of course, have more initial research and preparation than the estate. But not more than four times as many hours! I will therefore allow to the attorneys for the petitioner a counsel fee of $50,000. They will have to look to their client for any fees beyond that amount.

Finally the estate contends that the disbursements sought, which are in the sum of $5,967.62, are excessive. Itemized they are as follows:

| | |
|---|---:|
| Lexis | $1,904.44 |
| Federal Express, Courier | 453.83 |
| Photocopying | 183.65 |
| Travel, meals, parking | 1,812.50 |
| Fax and telephone | 1,613.20 |
| | $5,967.62 |

■ In this day and age where attorneys charge their clients customarily on an hourly basis, overhead of the firm is or should be included in the calculation of appropriate hourly rates. Thus, normal postage, photocopying, telephone should be borne by the firm and not charged to the client. Again, unless there is some

emergency, Federal Express or courier services should not automatically be used and then charged to the client. On the other hand, the court is aware that computer and search fees are charged to law firms and thus, to the extent used, are justifiable, reimburseable items.

In the present matter, where the petitioner seeks to have the estate reimburse her for substantial disbursements, close scrutiny must be made of the expenses claimed. So, dealing with them seriatim I find:

a) Lexis charges are appropriately reimbursed and will be allowed.

b) As to Federal Express and courier services, no explanation has been offered as to the need for so much use of these. They are disallowed.

c) Photocopying is a normal part of overhead, barring some unusual and voluminous number of copies. Thus, it will be disallowed.

d) Travel, meals and parking are normally expenses to be reimbursed by the client. However, in this instance it was the choice of petitioner to ask for the admission *pro hac vice* of Horsley. Thus it is only fair that she bear the cost of his travel in the sum of $1582.74. Local business meals and parking will be allowed in the sum of $229.76.

e) Of the fax and telephone charges $1,420.07 is attributable to faxes sent to Diana, which faxes her counsel represented at the hearing on counsel fees, were sent at her specific request, rather than through the mail. She must bear that expense and not impose it on the estate. The balance for telephone charges in the sum of $193.13, barring explanation of something unusual not offered here, is a normal expense of overhead. Thus, these expenses will be disallowed.

Summing up, the disbursements the court will allow are in the sum of $2,284.20 comprised of Lexis charges of $1,904.44, parking

and local business meals of $229.76 and $150 filing fees, the latter which I note were not shown on the list of disbursements.

A copy of the order filed this day is enclosed.