┌─────────────────────────────────────────────────────────┐
│                **NOT FOR PUBLICATION WITHOUT THE**       │
│              **APPROVAL OF THE APPELLATE DIVISION**      │
│                                                          │
│  This opinion shall not "constitute precedent or be binding upon any court." │
│  Although it is posted on the internet, this opinion is binding only on the  │
│    parties in the case and its use in other cases is limited. R.1:36-3.      │
└─────────────────────────────────────────────────────────┘

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0561-15T3

IN THE MATTER OF THE ESTATE OF
SAMUEL JOSEPH FEINER, DECEASED.

_____

LYLE BROOCHIAN and MOSHE
FEINER,

    Plaintiffs-Respondents,

v.

USHER FEINER and PEARL
BERKOVITS,

    Defendants-Appellants.

_____

CHILDREN OF DAVID FEINER,

    Intervenors-Respondents.

_____

Submitted September 25, 2017 — Decided October 3, 2017

Before Judges Sabatino, Whipple and Rose.

On appeal from Superior Court of New Jersey, Ocean County, Chancery Division, Docket No. 190695.

The Salvo Law Firm, PC, attorneys for appellants (Cindy D. Salvo, on the briefs).

Law Offices of Taff & Davies, attorneys for respondent Lyle Broochian (Joel A. Davies, of

counsel and on the brief, Matthew K. Kalwinsky
and Christina V. Acker, on the brief).

Keith, Winters & Wenning, LLC, attorneys for
respondent Moshe Feiner (Michael J. Wenning,
on the brief).

The Kelly Firm, PC, attorneys for intervenors-
respondents (Chryssa Yaccarino, on the letter
relying on the briefs filed on behalf of
respondents).

PER CURIAM

This marathon probate litigation was adjudicated through a protracted trial that consumed twenty-five days over a ten-month period, following four years of pretrial discovery supervised by the trial judge. The dispute within this Orthodox Jewish family pitted two siblings, plaintiffs Lyle Broochian ("Lyle") and Moshe Feiner ("Moshe"), against their siblings, defendants Usher Feiner ("Usher") and Pearl Berkovits ("Pearl").[1] The dispute centered upon wills and inter vivos transfers of property of the siblings' now-deceased parents, Samuel Feiner ("Samuel") and his wife Sara Feiner ("Sara"), which plaintiffs challenged as invalid.[2]

After considering extensive testimony and more than a hundred exhibits, the trial judge issued a detailed oral opinion over the course of two days, declaring Sara's and Samuel's wills null and

---

[1] For ease of reference, we use first names for the family members mentioned in this opinion, intending no disrespect in doing so.

[2] At times Sara's first name is spelled in the record as "Sarah."

A-0561-15T3

void, removing Pearl as administrator of Sara's estate, and appointing a substitute independent administrator. Having nullified the wills, the judge ordered the distribution of the assets of the estates instead by intestacy. The judge also invalidated various inter vivos transfers of real and personal property. The judge awarded counsel fees to the prevailing parties. In addition, the judge denied defendants' motion to set aside the final judgment because of their claimed inadvertent, post-trial discovery of a 1979 will purportedly executed by Samuel.

Defendants now appeal, challenging a host of the trial judge's determinations and claiming that his evidential and legal decisions were flawed and biased. We discern no merit to defendants' contentions, and therefore affirm.

I.

There is no need for us to repeat here the lengthy factual chronology comprehensively set forth in the trial judge's two-day oral opinion. We offer the following synopsis, recognizing that defendants dispute many of the judge's factual determinations.

Samuel was a wealthy diamond dealer and property owner who divided his time between Brooklyn, New York, and, later in his advanced age, Lakewood, New Jersey. After surviving the Holocaust, Samuel moved to America as a widower with his daughter, Gita.

Gita's mother, Samuel's first wife, was killed by the Nazis during World War II.

Although Samuel lacked formal education and never became a fluent English speaker or writer, he functioned capably in Yiddish-speaking communities and was a successful businessman. He married Sara, and had with her six additional children: Moshe, Lyle, the late David Feiner ("David"), Yankiel Feiner ("Yankiel"), Pearl, and Usher.[3]

Plaintiffs' challenge to the estates and property transfers revolved around whether Samuel and Sara intended to largely disinherit them in favor of defendants Pearl and Moshe. Defendants were strict followers of Orthodox Judaism, as Samuel and Sara were. Pearl and Usher lived in Lakewood. Their parents subsidized their living costs so that both Usher and Pearl's husband could devote themselves to studying the Torah.

Samuel, with Sara being listed on the titles, purchased several properties for Usher and Pearl to live in or rent out for income. Over time, Samuel and Sara eventually purchased their own house in Lakewood. They titled the property to Congregation Torah Veyirah D'Satmar ("Satmar"), a Jewish organization affiliated with

_____

[3] Yankiel and Gita did not participate as parties in the litigation but testified for defendants. David's children did not testify or join the litigation, but their interests were represented by counsel as intervenors.

Usher. Several years later, Sara secured a $1 million mortgage on the property from Satmar, although there was apparently no mortgage note or evidence of any debt owed to her.

In 2003, Sara signed a will ostensibly leaving most of her assets to Samuel and four properties to Pearl. None of the children claim to have known at the time about that will's existence. A nonlawyer friend of Usher's apparently drafted the will after buying a form will packet from a stationery store. The friend had it notarized after Sara stopped him on the street one day and asked him to do so. Sara did not have any other will.

In early 2004, on the eve of a trip to Florida, Usher accompanied Sara and Samuel to the office of a real estate attorney in order to transfer seven properties from Sara's name to Sara and Samuel as tenants in common. These were properties that Usher lived in or managed. Around the same time, Sara assigned the mortgage for the Satmar property to Usher.

While in Florida, Sara unexpectedly died on January 27, 2004, suffering a heart attack in a swimming pool. Within weeks of her death, Usher asked the real estate attorney to re-deed the seven properties to Sara and Samuel as husband and wife, supposedly because the previous deeds designating them as tenants in common had been drafted in error. Although the attorney knew that Sara had died, he followed Usher's instruction. In 2004, the same

5

attorney handled a transfer of those properties to Usher from Samuel as widower.

In her 2003 will, Sara named Samuel the executor of her estate, and in his absence, Pearl. Pearl claimed that Samuel had renounced his role as executor, but the Surrogate's Court in Ocean County lacked a record of that renunciation. Nevertheless, in May 2004, the court issued letters testamentary to Pearl, and she began to probate Sara's estate. Pearl did not notify any of her siblings about Sara's will, nor did she hire an attorney to manage the administration. She did, however, hire an attorney to transfer the estate properties into her individual name. Up until this trial in 2014 and 2015, the probate on Sara's will was incomplete and several estate bank accounts remained open.

As of the time Sara died, she and Samuel had been living in Lakewood alone. She was the primary caretaker for Samuel, who was much older than her and who had health problems. After her death, Usher, Usher's wife, and their ten children moved into the Lakewood mansion with Samuel; Pearl lived next door.

By this point, Usher's wife and Pearl became Samuel's primary caretakers. Although the parties' testimony varied as to how independent Samuel was at that time, they essentially agreed that Samuel continued to study Torah, but he could not understand complex ideas in English or walk without aid of either a person

or walker. To a large extent, Samuel relied primarily on Pearl's and Usher's families for assistance. Around this time, Usher and Pearl started a charity in their mother's name, funding it with $50,000 from Samuel. Usher and Pearl are listed on the charitable incorporation documents filed with the State, but Samuel is not. The charity at one point loaned money to Usher.

After their mother died, Usher and Pearl accompanied Samuel, later in 2004, to make a will with an English-speaking attorney. Although that attorney testified that he did not remember making Samuel's will and that he did not keep any notes, the attorney testified that he would not have participated in the process if Samuel could not understand him. In his 2004 will, Samuel left his interest in two Brooklyn properties to be divided equally among his children and David's children. The residuary of the estate, including diamonds, properties, bank accounts, and other assets, were all left in the will to Usher and Pearl, who were also named Samuel's co-executors.

Samuel died in 2011 at the age of ninety-nine. Upon learning that Pearl and Usher were attempting to probate Samuel's estate, Lyle challenged the estate's administration in the Probate Part in October 2011. In her complaint that Moshe later joined, Lyle contested the validity of Samuel's 2004 will. The complaint also contested inter vivos property transfers that had been made by

Samuel, claiming that undue influence had been exercised over him by Pearl and Usher. In addition, plaintiffs contested transfers that Sara had made and her 2003 will, alleging forgery.

Plaintiffs sought to void these transfers and both parents' wills, and to administer their estates under New Jersey's intestacy statutes, N.J.S.A. 3B:5-1 to -14. They also requested attorney's fees under Rule 4:42-9(a)(3).

Defendants vigorously denied their siblings' allegations of impropriety. They asserted that Samuel and Sara had purposefully and legitimately rewarded them for their religious devotion and caring for their elderly parents.

Over the course of four years, the assigned General Equity judge, Hon. John A. Peterson, Jr., oversaw a lengthy discovery process. The judge issued many discovery orders, a number of which defendants did not comply with fully. Later during trial, defendants attempted to offer documents into evidence that they previously had refused to disclose, or which they had denied existed.

On intermittent trial dates over ten months in 2014 and 2015, the judge heard extensive testimony from the parties, as well as all living siblings, the Feiners' attorneys, neighbors, and other persons who had been involved with the properties.

After hearing plaintiffs' case-in-chief, Judge Peterson ruled that a presumption of undue influence had been "overwhelmingly" established. That finding was based on the confidential relationship that Usher and Pearl had with their parents, in addition to "suspicious circumstances" found by the court surrounding the creation of the parents' respective wills.

Following the trial, the judge issued his lengthy oral bench ruling in May 2015. Most fundamentally, the judge found that Usher and Pearl were not credible. Indeed, the judge's credibility findings in this regard were repeated and emphatic.

Specifically, in an accompanying eighteen-page May 8, 2015 final judgment, the judge ruled, among other things, that: (1) Sara's will was void for undue influence; (2) Samuel's will was also void for undue influence; (3) Pearl and Usher were removed as executors from the estates and an independent executor was appointed and ordered to undergo an accounting; (4) the estates were to be administered based on intestacy laws; (5) property transfers and mortgage assignments by Sara, Samuel, and their estates to Usher and Pearl were voided for undue influence; (6) a $50,000 judgment was issued against defendants for Samuel's money paid to the charity; (7) Pearl and Usher were to turn over all personal property, safe deposit boxes, and bank accounts associated with their parents; and (8) Pearl and Usher were to pay

fees for the attorneys of plaintiffs and David's children. In a separate order, the judge applied a fifty percent fee enhancement multiplier to the counsel fees that he awarded to plaintiffs and David's children as prevailing parties.

About three months after the entry of May 2015 final judgment, Usher and Pearl filed a motion for relief under Rule 4:50-1. They claimed to have found a 1979 will executed by Samuel that purported to leave the bulk of his estate to Pearl, Usher, and Lyle. They contended this will had been left in an area of Usher's (formerly Samuel's) house that they seldom used, located in a box under the basement stairs.

The judge ordered limited discovery on the new trial motion. Following oral argument, the judge denied the motion on April 6, 2016, finding that Usher had not acted diligently in attempting to locate all documents related to the probate, as he had possession of the documents in his home the entire time. The judge also found that Pearl shared responsibility for this failure.

Two days after the judge rejected their new trial motion, Usher and Pearl nonetheless attempted to probate the 1979 will by filing a complaint with the Probate Part. The judge dismissed the probate complaint, citing principles of res judicata, in an order dated June 15, 2016.

This appeal followed.

Through their new counsel on appeal, defendants present several arguments. They contend that the trial judge improperly found they had engaged in undue influence, because the evidence was insufficient to support such a finding. Defendants also assert that the judge was biased because he personally disfavored parents disinheriting their children.

Defendants further argue the judge lacked sufficient evidence to shift the burden of proof as to their parents' wills, or the inter vivos transfers. They contend that their parents had deliberately benefited them in their wills due to their religious devotion, which by contrast, plaintiffs allegedly lacked. Further, they argue because plaintiffs did not plead undue influence in their initial complaint concerning Sara's will, the judge had procedurally erred in ruling against them as to her estate.

Additionally, defendants argue that the counsel fee multiplier applied by the trial judge was improper, that the judge lacked justification to deny their motion for new trial, and that principles of res judicata did not apply because the validity of the 1979 will had not been decided.

Having fully considered these contentions, we affirm the trial court's determinations in all respects, substantially for

the cogent and legally sound reasons articulated by Judge Peterson in his successive decisions in this case. The judge's painstaking factual findings and credibility rulings adverse to defendants are amply supported by the extensive trial record. In addition, we are confident that the judge adhered to the governing law and applied it fairly and appropriately.

Our Supreme Court has "firmly established in our case law" that a will may be set aside based upon a demonstration that it was procured through undue influence. In re Estate of Stockdale, 196 N.J. 275, 302 (2008). The concept of undue influence connotes "mental, moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets." Id. at 302-03. This is generally accomplished "by means of a will or inter vivos transfer in lieu thereof." Id. at 303.

Typically, the challenger of a will maintains the burden of proof in showing undue influence. Id. However, that burden shifts when a beneficiary "stood in a confidential relationship to the testator and if there are additional 'suspicious' circumstances" present. Ibid. (citing In re Rittenhouse's Will, 19 N.J. 376, 378-79 (1955)). If the confidential relationship is not a professional one, as in an attorney-client relationship, the

burden may be overcome by a preponderance of the evidence.  Ibid. (citing In re Catelli's Will, 361 N.J. Super. 478, 487 (App. Div. 2003)).  "When a confidential relationship exists between a testator and a beneficiary who draws his will, the court's suspicions are strongly aroused whether or not a presumption is created."  5 Alfred C. Clapp, N.J. Practice — Wills and Administration, § 61 at 214 (1982) (citing Bennett v. Bennett, 50 N.J. Eq. 439 (Prerog. Ct. 1892); Brick v. Brick, 43 N.J. Eq. 167 (Prerog. Ct. 1887)).

The Supreme Court has held that a confidential relationship exists when "the testator, 'by reason . . . weakness or dependence,' reposes trust in the particular beneficiary, or if the parties occupied a 'relation[ship] in which reliance [was] naturally inspired or in fact exist[ed].'"  Stockdale, supra, 196 N.J. at 303 (quoting In re Hooper, 9 N.J. 280, 282 (1952)). Additionally, a confidential relationship is present "when the circumstances make it certain that the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed."  In re Codicil of Stroming, 12 N.J. Super. 217, 224 (App. Div.), certif. denied, 8 N.J. 319 (1951).  To find suspicious circumstances that shift the burden, those suspicions

"need only be slight." Stockdale, supra, 196 N.J. at 304; see also Haynes v. First Nat'l State Bank, 87 N.J. 163, 176-78 (1981).

Similar principles apply for setting aside inter vivos gifts and property transfers on the grounds of undue influence. To establish a presumption of undue influence and shift the burden of proof, a challenger must show either that "the donee dominated the will of the donor, Seylaz v. Bennett, 5 N.J. 168, 172 (1950); Haydock v. Haydock, 34 N.J. Eq. 570, 574 (E. & A. 1881), or . . . a confidential relationship exist[ed] between [the] donor and donee, In re Dodge, [50 N.J. 192, 227 (1967)]; Mott v. Mott, 49 N.J. Eq. 192, 198 (Ch. 1891)." Pascale v. Pascale, 113 N.J. 20, 30 (1988). Accord Sipko v. Koger, Inc., 214 N.J. 364, 376 (2013). However, inter vivos gifts, unlike wills, do not require challengers to show suspicious circumstances to be set aside. Pascale, supra, 113 N.J. at 30-31.

To rebut the presumption after the burden switches, the beneficiary of a gift challenged for undue influence must establish his or her case by clear and convincing evidence. Id. at 31. The beneficiary must prove "not only that 'no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood.'" Ibid. (citing Dodge, supra, 50 N.J. at 227).

14

Applying these standards here, Judge Peterson reasonably determined that plaintiffs had proven that Usher and Pearl had such a confidential relationship with their parents, and that there were suspicious circumstances surrounding the wills and property transfers that shifted the burden to defendants to establish their validity. The judge concluded that defendants had not met that shifted burden of showing the legitimacy of the challenged instruments. We are satisfied there is abundant evidence in the record to support the judge's findings in this regard.

We must be mindful that our scope of review is limited. Although a probate judge's post-trial factual findings concerning issues of testamentary capacity and undue influence are not automatically controlling, such findings "are entitled to great weight [on appeal] since the trial court had the opportunity of seeing and hearing the witnesses and forming an opinion as to the credibility of their testimony." In re Will of Liebl, 260 N.J. Super. 519, 523 (App. Div. 1992), (quoting Gellert v. Livingston, 5 N.J. 65, 78 (1950)), certif. denied, 133 N.J. 432 (1993). Unless the trial judge's findings are "so manifestly unsupported or inconsistent with the competent, reasonably credible evidence" the factual conclusions should not be disturbed. Id. at 524 (citing Leimgruber v. Claridge Assocs., Ltd., 73 N.J. 450, 456 (1977)).

A-0561-15T3

Such a "manifest" lack of evidential support simply has not been demonstrated by defendants on this appeal. The record is replete with proof, including, among other things, the peculiar circumstances in which Samuel's and Sara's wills were prepared and executed, to support Judge Peterson's determinations.

We are equally satisfied that Judge Peterson faithfully and fairly applied the governing principles of law in this case, despite defendants' efforts on appeal to portray his rulings as biased and flawed. Defendants complain that the judge mentioned numerous times in his various rulings that the laws of intestacy ordinarily provide for the equal distribution of the assets of a parent among his or her surviving children, and that testators commonly provide for equal distribution of their estates to each of their surviving children. There is nothing inherently wrong with the judge recognizing the legal consequences of intestacy, see N.J.S.A. 3B:5-3, or that testators often distribute their assets in equal shares. We do not believe that the judge operated under some false assumption that competent parents are not entitled under the law to make wills that unequally divide their assets to their survivors. In fact, the judge's May 2015 oral opinion expressly acknowledged that "a testator is not required to divide his estate equally among his children" and "may even exclude one or more" family members from his or her will.

16

To be sure, the judge expressed skepticism about the contentions that defendants presented in this case. But that skepticism was justified by both the trial evidence, and what he found to be the more credible testimony of plaintiffs and their own witnesses. Although defendants advocated an opposing theory, the judge had ample evidence to conclude that the parents here did not want to disinherit any of their children. There is no "objectively reasonable" basis to conclude that the trial proceedings were unfair to defendants. Denike v. Cupo, 196 N.J. 502, 517 (2008); see also Liteky v. United States, 510 U.S. 540, 556, 114 S. Ct. 1147, 1157, 127 L. Ed. 2d 474, 491 (1994) (observing that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge") (Kennedy J., concurring).

In sum, the final judgment entered by the trial court was founded upon a fair and meticulous assessment of the record and a sound application of legal principles. As the trier of fact, the judge simply found defendants and their witnesses less credible than plaintiffs' witnesses, and he was entitled to do so. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974).

The judge specifically did not err in rejecting defendants' belated post-trial proffer of the 1979 will of Samuel they claimed to have only recently discovered in Usher's basement. Rather than abruptly reject this proffer out of hand, the judge prudently conducted an evidentiary hearing. He then concluded Usher and Pearl had not diligently acted to attempt to find this 1979 document, which generally was not as favorable to their interests (because it included a distribution to Lyle) as the wills they had advocated to enforce at the trial. Although the purported 1979 will was found in Usher's residence, Pearl shared the responsibility to locate it sooner because of her own duties as a fiduciary. This is buttressed by the judge's earlier observation at the conclusion of the trial, characterizing Pearl's conduct as "gross carelessness and indifference to her fiduciary role."

We likewise agree with the judge's application of res judicata principles in dismissing plaintiffs' attempt to probate the 1979 will. Having denied defendants' motion for the extraordinary relief of a new trial stemming from their discovery of the 1979 will, the judge rightly barred defendants' subsequent attempt to relitigate his decision. In re Estate of Gabrellian, 372 N.J. Super. 432, 446 (App. Div. 2004).

Next, we reject defendants' argument that the judge erred in ordering a $50,000 repayment of the estate funds paid to the

charity.  We are mindful that the court-appointed administrator determined, post-judgment, that the charity was legitimate.  However, the administrator's determination of the charity's legitimacy does not automatically mean that the judge erred in ordering the funds that had been paid to the charity to be repaid.  In fact, the judge specified that any party in interest could, on motion, petition the court to modify this aspect of the final judgment, following the accounting of the charity.  Defendants did not file such a motion for relief.  Even so, they still maintain, without prejudice, the right to do so in the trial court, within a reasonable time after our decision in this appeal.

Lastly, defendants have not persuaded us that the trial court's awards of counsel fees, made pursuant to Rule 4:42-9(a)(3), should be disturbed.  Well-established case law governing counsel fees instructs that such fee awards by trial courts should be disturbed "only in the rarest of occasions, and then only because of a clear abuse of discretion."  Rendine v. Pantzer, 141 N.J. 292, 317 (1995).  The fees awarded by the trial judge here to the prevailing parties were reasonable, and are not reflective of any abuse of discretion.

As we have noted, this was a lengthy and hard-fought litigation that consumed four years of pretrial discovery and over twenty-five days of trial.  The trial judge who oversaw that whole

19

process was in a superior position to assess the nature and quality of the legal services that counsel provided, and the reasonableness of their charges.  In addition, the fifty percent multiplier the judge applied to the fee lodestar amount was an enhancement well within the court's discretion.  Rendine, supra, 191 N.J. 316-17; In re Estate of Reisen, 313 N.J. Super. 623, 630 (Ch. Div. 1998).

The balance of defendants' arguments, to the extent we have not already addressed them explicitly, lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION