771 A.2d 1194

PACKARD–BAMBERGER & CO., INC., A NEW JERSEY CORPORA-TION; AMERICAN BEAUTY PARLOR, INC., A NEW JERSEY CORPORATION; JOHN PACKARD AND LYNN PACKARD, PLAINTIFFS–APPELLANTS, v. ANDREW COLLIER; PACK-ARD'S TRAVEL AGENCY, INC. AND HUDSON VALLEY REAL-TY CORP., DEFENDANTS & THIRD PARTY–PLAINTIFFS, AND DANIEL AMSTER AND AMSTER & ROSENSWEIG, ESQS., DEFENDANTS–RESPONDENTS, AND ALFIERO PAL-ESTRONI, THIRD–PARTY DEFENDANT & DEFENDANT ON THE COUNTERCLAIM.

Argued January 16, 2001—Decided May 30, 2001.

430

*Clark E. Alpert*, argued the cause for appellants (*Alpert Butler & Sanders*, attorneys; *Mr. Alpert* and *David N. Butler*, on the briefs).

*Theodore L. Abeles,* argued the cause for respondents (*Tompkins, McGuire, Wachenfeld & Barry,* attorneys; *Mr. Abeles, Marianne Espinosa Murphy* and *Brian M. English,* on the brief).

The opinion of the Court was delivered by

VERNIERO, J.

The principal issue in this appeal is whether the trial court erred in awarding counsel fees to plaintiffs in connection with their suit brought against a corporate director who also served as legal counsel to the corporation. Finding intentional misconduct on the part of the attorney-director, the trial court awarded counsel fees on the basis of *Saffer v. Willoughby,* 143 *N.J.* 256, 670 *A.*2d 527 (1996). In *Saffer,* we held that a client may recover reasonable expenses and attorneys' fees as consequential damages for attorney malpractice.

The Appellate Division reversed the trial court's award of counsel fees, concluding that the principles espoused in *Saffer* were inapplicable. The panel affirmed the trial court on numerous other issues. We agree with the trial court that the holding in *Saffer* should extend to attorney misconduct cases. We thus reinstate plaintiffs' counsel fee award. In all other respects, we affirm the judgment of the Appellate Division.

I.

This long-running litigation involves the struggle for control of Packard–Bamberger & Company (PB). To place our disposition in its proper context, we must set forth portions of the record in some detail, as well as the relevant history of several related lawsuits.

Frank Packard (Frank) founded PB with a partner in 1933 and ran it until his death in 1981. The centerpiece of PB's business was a supermarket and department store located on a ten-acre parcel in Hackensack. In the 1950s, Frank created American Beauty Parlor (ABP), a subsidiary of PB, which operated a beauty

parlor and barbershop at PB's Hackensack facility, as well as a beauty parlor in New York City. Frank, through ABP, also incorporated Hudson Valley Realty Corporation (HVRC). ABP held half of the HVRC stock and Frank's friend, Emil Buehler (Buehler), held the other half. Shortly after its incorporation, HVRC purchased approximately 8400 square feet of property next to PB's parcel in Hackensack.

From 1969 until Frank's death in 1981, PB and ABP were managed by the same board of directors: Frank, Andrew Collier (Collier), and Daniel Amster (Amster). Collier was a long-time employee, director, and officer of PB, beginning work there in 1941. Amster served as legal counsel for PB and ABP, in addition to serving as Frank's personal attorney.

Frank's 1981 death sparked a battle for control of the companies. Before he died, Frank arranged for his son John to purchase certain PB stock from John's brother and to place that stock under Frank's control. Frank and John thereafter entered into a voting trust agreement in which they agreed that control of the stock would pass to John at Frank's death. Following his father's death, John commenced litigation to enforce that agreement. The Chancery Division held that the agreement was unenforceable and instead ordered the following breakdown of ownership of PB shares: John (250 shares); Frank's son, Peter Packard (Peter), (250 shares); Frank's estate (242 shares); and Collier (1 share). The corporation retained 250 shares of stock.

Also following Frank's death, Collier assumed the position of chief operating officer of PB, and continued in his other roles as officer and director. Meanwhile, John had moved into Frank's office within a week of his father's death, and announced that he was taking over his father's role in running the company. Notwithstanding John's announcement, Collier and Amster voted to make Frank's widow, Margaret, a director of PB, and to raise Collier's salary by twenty-five percent.

Amster and Margaret also served as co-executors of Frank's estate and began to have problems working together. As a result,

United Jersey Bank (UJB) was appointed as a third co-executor. Thereafter, UJB initiated a probate proceeding concerning the administration of Frank's estate. During that litigation, the trial court convened a PB shareholder's meeting for the purpose of allowing shareholders to vote on the dissolution of PB. Frank's estate and Peter, collectively owning a majority of shares, voted to dissolve PB; John and Collier dissented, each desiring to maintain PB's corporate existence.

After the dissolution vote, the trial court entertained offers for PB. The court afforded the two dissenters the opportunity to purchase the shares belonging to Frank's estate and Peter. In response, Collier offered to purchase the estate's, Peter's, and John's shares; John offered to buy the estate's shares. The court rejected those offers, approving instead a $4 million proposal from a real estate development company, Poskanzer and Tulp, for PB's Hackensack property. The court also ordered the liquidation of PB.

The Appellate Division reversed those rulings, remanding the matter for further proceedings. On remand, a different trial court evaluated the competing offers of John and Collier for the estate's interest in PB and decided that John's offer would be accepted. Prior to December 1986, John had purchased the interest that his brother Peter held in PB. Consequently, John gained control of PB's outstanding stock, with the exception of Collier's one share.

During the period when the trial court was accepting offers for PB, Frank Bovino (Bovino), a co-owner of Sherbrooke Realty and Construction Company (Sherbrooke), wrote several letters to Collier expressing Sherbrooke's interest in purchasing PB's property. Bovino wanted to build a twenty- to twenty-four floor mixed-use high rise that was to include stores, offices, and hotel space. Bovino sent his first letter to Collier in July 1985, to which Collier did not respond. Bovino sent a second letter in September 1985, and Collier responded a month later requesting a copy of Bovino's proposal. Bovino responded promptly with a proposal to purchase

all of PB's property and a request for a survey of the property. Collier did not answer.

In November 1985, Bovino sent another letter to Collier asking for his assistance so that Bovino could submit a purchase price offer. Collier again did not answer. Bovino wrote to Collier in February 1986 to reiterate his interest in the property and to seek a meeting with Collier to discuss a possible purchase. In May 1986, Bovino wrote his final letter to Collier in which he indicated that Sherbrooke would offer a purchase price of $12 million for the PB property. The $12 million offer was approximately three times greater than any other offer that had been received for the PB property. The record indicates that Collier showed the exchange of letters to Amster who, in turn, helped Collier prepare the October 1985 response to Bovino. As discussed below, the alleged failure by defendants to inform plaintiffs of Bovino's proposal forms the basis of plaintiffs' breach of duty claim.

Buehler, the co-owner of HVRC, died in 1984. A few months after Buehler's death, John contacted a representative of Buehler's estate and informed the representative that PB would be interested in purchasing the estate's interest in HVRC. In response, the representative informed John that the estate was not planning to sell its interest in HVRC. Unbeknownst to John, Collier also contacted representatives of Buehler's estate about the sale of the HVRC stock. Collier and the estate's attorney, Charles Buhrman (Buhrman), exchanged a series of letters concerning a potential sale. Collier's letters suggested that he was acting in his capacity as an officer of PB. Those letters did not lead to a transaction.

After John gained control of PB, Collier again contacted Buhrman and negotiated the terms of a purchase by Collier, in his individual capacity, of the estate's HVRC stock. John was unaware of Collier's renewed contact. Collier and Buehler's estate agreed to a purchase price of $220,000. Buhrman prepared the terms of the contract, which Collier signed on December 30, 1986.

Amster played a role in respect of the HVRC stock issue. In 1987, Amster and Collier executed a written agreement that made Amster the beneficial owner of half of Collier's HVRC stock, in return for Amster paying Collier half of the $220,000 purchase price. John alleges that Amster was involved in the purchase from the outset, but Amster and Collier denied that allegation, claiming instead that Amster learned of the purchase only after Collier completed the transaction with the estate. As explained below, Amster's role forms the basis of plaintiffs' claim that Amster usurped a corporate opportunity for his own benefit.

As noted, John eventually gained control of PB. He thereafter acted to consolidate his authority by electing himself, his wife, and his daughter as directors, and by naming himself president of the company. John discharged Amster as legal counsel for PB, although Amster continued to provide some legal services for the company through June 1987. John also removed Collier as vice-president and secretary-treasurer. Collier remained with the company as comptroller until June 1987, when John removed him from that position as well.

## II.

Against that backdrop, John, PB, and ABP filed this present action against Collier in June 1987. Plaintiffs twice amended their complaint, adding Amster and his law firm as defendants. After extensive discovery, the parties agreed to limit the trial to two main issues: whether defendants breached their fiduciary duties by failing to reveal Bovino's offer for PB's Hackensack property and whether defendants usurped a corporate opportunity by purchasing the Buehler estate's interest in HVRC.

The trial took place between April 1993 and August 1993, after which the trial court made several factual and legal findings. Concerning the claim relating to defendants' alleged breach of their fiduciary duties, the court found that both Amster and Collier owed such duties to PB as directors of the company during the period in which Bovino submitted his offer. The court con-

cluded that defendants should have informed John and all interested parties about Bovino's offer, even though Collier had competed with John for control of the company. In respect of Amster, the trial court found that he knew about Bovino's offer to Collier. Additionally, the court determined that Amster not only had a duty to disclose the offer because he was a director of PB, but also "had an additional obligation of disclosure imposed by reason of his position as counsel."

Concluding that defendants had a duty to reveal the Bovino offer and that they breached that duty, the court nonetheless ruled that plaintiffs did not suffer damages as a result of that breach. The premise of plaintiffs' damages claim was that if Collier and Amster had properly disclosed the offer, Bovino would have purchased PB's property for $12 million. The trial court rejected that position, stressing that there were so many conditions and contingencies attached to Bovino's offer that the court could not "conclude by anything close to a preponderance of the evidence that a sale to Bovino for anything like 12 million dollars would ever have been consummated." Thus, the court reasoned that Amster's and Collier's breach of their respective duties did not cause any actual damage to plaintiffs.

Regarding the second issue, namely, whether defendants usurped a corporate opportunity by purchasing stock in HVRC, the trial court rejected the denials of defendants about Amster's involvement in Collier's purchase. Instead, the court found that the two men discussed and reviewed the purchase contract prior to Collier completing the transaction. Thus, the court concluded that Amster knew about Collier's efforts to purchase the HVRC stock and assisted him in that transaction. In considering whether that purchase constituted a wrongful usurpation of a corporate opportunity, the court found that the HVRC parcel would have enhanced the value of the main PB property and, therefore, the potential to purchase the HVRC stock was a corporate opportunity. Accordingly, the court ruled that Amster and Collier had an

obligation to present the opportunity to PB and not divert it for their own benefit.

Moreover, the court rejected the claim of Collier and Amster that their removal as directors of PB, which occurred prior to Collier's purchase of the HVRC stock, eliminated their obligations to PB. The court declared that Amster owed an additional obligation because of his role as legal counsel to PB and ABP. In that regard, the court determined that Amster violated the Rules of Professional Conduct because he did not reveal to his client, PB, an opportunity that rightfully belonged to it, but instead took advantage of the opportunity for his own personal gain.

Having concluded that Amster and Collier breached their fiduciary obligations in purchasing the HVRC stock, the court considered the appropriate remedy. Plaintiffs presented expert testimony that they had suffered damages of $9,625,000 from Collier's and Amster's usurpation of the corporate opportunity. The trial court rejected that claim, finding that plaintiffs had failed to prove that they suffered monetary damages from defendants' breaches. Consequently, the court denied plaintiffs any monetary relief. Nonetheless, the court ruled that principles of equity required Collier and Amster to transfer the HVRC stock to PB, without cost, because they had wrongfully acquired it for themselves.

In addition to resolving those two main issues, the court also rejected plaintiffs' punitive damages and spoliation claims, as well as plaintiffs' request for an award of attorneys' fees. The trial court concluded that it "was not unaware of the fact that [the court has] found the defendants guilty of a number of instances of wrongful conduct but [has] rejected the enormous claim for damages. But that, in a nutshell, is what this case turns out to be."

After rendering its decision, the trial court referred the case to a special master to consider several remaining issues. In a series of rulings, the special master rejected plaintiffs' racketeering claim, as well as a professional malpractice claim that Amster negligently performed legal services involving the removal of certain underground tanks from PB's property. Additionally, the

special master recommended that Amster be ordered to disgorge certain legal fees that PB paid to him between 1983 and 1987.

Following those rulings, the case returned to the trial court. Prior to any further hearings, Collier and plaintiffs settled their claims. Consequently, the trial court considered only those issues related to Amster. The court accepted most of the special master's recommendations. Specifically, in respect of whether Amster should return fees paid to him by PB for his performance of legal services, the court ordered Amster to return $4173. In reaching that conclusion, the court found that Amster had received $15,153 in tainted legal fees, which involved services related to Amster's secret assistance to Collier in his attempt to gain control of the company. The court also found that PB owed Amster $10,980 in unpaid, untainted fees. Thus, $4173 represented the difference between those two figures.

Additionally, the court, relying on *Saffer, supra,* 143 *N.J.* 256, 670 *A.*2d 527, which was decided after the court's initial denial of attorneys' fees, determined that plaintiffs were entitled to an attorney fee award. Noting that *Saffer* authorizes an award of fees to a claimant who successfully proves an attorney's negligence in a malpractice action, the trial court reasoned that similar authorization exists when an attorney commits intentional misconduct.

In respect of the amount of fees that plaintiffs were entitled to recover, the court explained that fees would be awarded only for those claims on which plaintiffs had obtained relief: the HVRC stock purchase issue and the disgorgement of Amster's tainted legal fees. The court determined that the HVRC stock issue provided plaintiffs with a benefit valued at $220,000, and the fee-disgorgement issue provided plaintiffs with a $15,000 benefit. Thus, the court stated that the "services for which [the court] found there should be an award of counsel fees comes to a total of $235,000." The court then divided that figure by three, rounded that number to $80,000, and entered judgment accordingly.

The parties advanced several arguments before the Appellate Division, which, except for the attorneys' fees award, affirmed the Chancery Division's rulings substantially for the reasons expressed by the trial court. Because plaintiffs had not succeeded on the one malpractice claim asserted against Amster, the Appellate Division concluded that the trial court was not authorized to award counsel fees. The Appellate Division reasoned that *Saffer* did not control and that an award of attorneys' fees was simply not appropriate under the circumstances.

We granted plaintiffs' petition for certification, 165 *N.J.* 488, 758 *A.*2d 647 (2000), which raises the full panoply of issues resolved by the lower courts. As noted, except for the counsel-fees question, the Appellate Division affirmed the Chancery Division's disposition of all issues, substantially for the reasons expressed by the trial court. We do likewise. See *Re/Max v. Wausau Ins. Cos.,* 162 *N.J.* 282, 286, 744 *A.*2d 154 (2000) (affirming trial court's disposition without extensive discussion). Our focus concerns the issue on which the lower courts disagreed, namely, whether plaintiffs are entitled to reasonable counsel fees against attorney-defendant Amster.

### III.

■ Although New Jersey generally disfavors the shifting of attorneys' fees, *North Bergen Rex Transp., Inc. v. Trailer Leasing Co.,* 158 *N.J.* 561, 569, 730 *A.*2d 843 (1999), a prevailing party can recover those fees if they are expressly provided for by statute, court rule, or contract. *Dep't of Envtl. Prot. v. Ventron Corp.,* 94 *N.J.* 473, 504, 468 *A.*2d 150 (1983). Many statutes expressly authorize such awards. *See, e.g.,* the Conscientious Employee Protection Act (*N.J.S.A.* 34:19–5e and 34:19–6), the Consumer Fraud Act (*N.J.S.A.* 56:8–19), and the Law Against Discrimination (*N.J.S.A.* 10:5–27.1). *Rule* 4:42–9 also provides for an award of attorneys' fees in certain situations, none of which applies in the present case.

In addition, in *Saffer*, we held that "a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred . . . in prosecuting [a] legal malpractice action." *Saffer, supra*, 143 *N.J.* at 272, 670 *A.*2d 527. *Saffer* involved a fee dispute between an attorney and a former client. *Id.* at 260, 670 *A.*2d 527. The client filed a request for fee arbitration. Before a decision was reached, the client discovered evidence that led him to file a legal malpractice claim in the Law Division against his former attorney. *Ibid.*

We considered the client's argument that the attorney should be prohibited from recovering any fee proximately related to the attorney's negligence, if proved. *Id.* at 269, 670 *A.*2d 527. One aspect of that issue was whether the legal expenses incurred by the client in recovering a favorable verdict against the attorney should be considered consequential damages. *Ibid.* In evaluating those questions, we emphasized that a client is entitled to recover for losses that are proximately caused by an attorney's negligence. We noted also that the purpose of a legal malpractice claim is to put the client in as good a position as he or she would have been if the attorney had performed competently. *Id.* at 269–71, 670 *A.*2d 527. Applying those tenets, we ruled that "[o]rdinarily, an attorney may not collect attorney fees for services negligently performed." *Id.* at 272, 670 *A.*2d 527.

Moreover, we determined that a negligent attorney could be held responsible for the reasonable legal expenses and attorneys' fees incurred by a former client who successfully asserted a legal malpractice claim. *Ibid.* In so doing, we reasoned that "[t]hose are consequential damages that are proximately related to the malpractice[,]" and that "unless the negligent attorney's fee is determined to be part of the damages recoverable by a plaintiff, the plaintiff would incur the legal fees and expenses associated with prosecuting the legal malpractice suit." *Ibid.*

The Court's holding in *Saffer* was applied in *Bailey v. Pocaro & Pocaro*, 305 *N.J.Super.* 1, 701 *A.*2d 916 (App.Div.1997). There, the plaintiffs argued that they should have recovered counsel fees

incurred in prosecuting their legal malpractice claim against their former attorney. *Id.* at 4, 701 *A.*2d 916. The Appellate Division agreed. The court observed that *Saffer* dictated "that a plaintiff who is economically injured by an attorney's legal deficiency should be made whole.... [T]he concept of 'wholeness' includes the attorney's fees and costs to pursue the malpractice claim." *Id.* at 6, 701 *A.*2d 916. *See also Davin, L.L.C. v. Daham,* 329 *N.J.Super.* 54, 71, 746 *A.*2d 1034 (App.Div.2000) ("[I]n appropriate circumstances, a client may be entitled to recover the costs of litigation in a professional malpractice action.").

In this case, as previously noted, the lower courts disagreed about whether to apply the holding in *Saffer*. The trial court reasoned that because *Saffer* authorizes a fee award in the legal malpractice context, it also permits an award of fees when an attorney is found liable for intentional wrongdoing. In contrast, the Appellate Division viewed the issue narrowly. It focused on the fact that the trial court dismissed plaintiffs' sole legal malpractice claim. The panel thus considered plaintiffs to be unsuccessful legal malpractice litigants. Accordingly, the panel concluded that plaintiffs were not entitled to an award of fees in the absence of a statute, contract, or specific rule of court.

■ We agree with the trial court that the holding in *Saffer* should be applied in this setting. The court found that Amster had committed intentional misconduct in his role as counsel. We see no compelling reason to deny plaintiffs an award of fees in that circumstance. Amster urges a contrary conclusion because recovery of counsel fees is not expressly authorized by *Saffer* or by any statute or other rule. Amster's position requires a circumscribed reading of *Saffer,* one that is inconsistent with the sound policies undergirding that decision. Such an approach would lead to the incongruous result that a plaintiff could recover counsel fees if successful in proving an attorney's negligence, but not when proving an intentional violation of a fiduciary duty arising as a result of the attorney-client relationship.

■ Stated plainly, an attorney who intentionally violates the duty of loyalty owed to a client commits a more egregious offense than one who negligently breaches the duty of care. A client's claim concerning the defendant-attorney's breach of a fiduciary duty may arise in the legal malpractice context. Nonetheless, if it does not and is instead prosecuted as an independent tort, a claimant is entitled to recover attorneys' fees so long as the claimant proves that the attorney's breach arose from the attorney-client relationship. Accordingly, we hold that a successful claimant in an attorney-misconduct case may recover reasonable counsel fees incurred in prosecuting that action.

■ We emphasize that a plaintiff must demonstrate the existence of an attorney-client relationship as a prerequisite to recovery. Such a requirement is consistent with the goal in *Saffer* of holding attorneys responsible for professional conduct that causes injury to their clients. It is likewise consistent with the policy, also suggested in *Saffer*, that a client should be able to recover for losses proximately caused by the attorney's improper performance of legal services. That policy is intended to assure that the client be placed in as good a position as if the attorney had performed properly.

Here, Amster's duties as a director and legal counsel basically overlapped. Amster owed fiduciary duties to PB in both of his roles, and his misconduct breached his duties as a director and as an attorney. Because Amster violated the duty he owed to PB as legal counsel, the trial court's award of attorneys' fees was proper. In contrast, if Amster had not been counsel to PB, his fiduciary duty to PB would have arisen solely from his status as a director. He would not have rendered any legal services to the corporation and, therefore, attorneys' fees would not have been appropriate unless authorized by contract, statute, or some other specific rule.

## IV.

■ In view of our holding, we must consider whether the trial court appropriately determined the amount of fees to be awarded

in this case. At the outset, we note that "fee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." *Rendine v. Pantzer*, 141 *N.J.* 292, 317, 661 *A.*2d 1202 (1995). That deferential standard of review guides our analysis.

The Court has stated previously that "a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice action." *Saffer, supra*, 143 *N.J.* at 272, 670 *A.*2d 527. We are satisfied that the same reasonableness standard should govern attorney-misconduct cases. In determining the reasonableness of a counsel fee award, the threshold issue "is whether the party seeking the fee prevailed in the litigation." *North Bergen Rex Transp., Inc., supra*, 158 *N.J.* at 570, 730 *A.*2d 843. The Court has established a two-pronged test to determine whether the party seeking fees was a prevailing party. *Ibid.*

The first prong requires that the litigant seeking fees establish that the " 'lawsuit was causally related to securing the relief obtained; a fee award is justified if [the party's] efforts are a "necessary and important" factor in obtaining the relief.' " *Ibid.* (quoting *Singer v. State*, 95 *N.J.* 487, 494, 472 *A.*2d 138, *cert. denied*, 469 *U.S.* 832, 105 *S.Ct.* 121, 83 *L.Ed.*2d 64 (1984)). That prong requires the party seeking fees to demonstrate a factual nexus between the pleading and the relief ultimately recovered. *Ibid.*

The second prong involves a factual and legal determination, requiring the party seeking fees to prove that " 'the relief granted has some basis in law.' " *Id.* at 571, 730 *A.*2d 843 (citation omitted). The party seeking fees need not obtain all relief sought, but there must be a resolution of some dispute that affected the defendant's behavior towards the prevailing plaintiff. *Ibid.*

Applying the two-pronged test, we agree with the trial court that plaintiffs are prevailing parties in respect of the fee-disgorgement issue and the issue concerning the return of the

HVRC stock. Plaintiffs obtained relief in connection with those two issues, and the relief was well grounded in law. The trial court explicitly rejected the notion that plaintiffs could be considered prevailing parties on any other issues. Likewise, the Appellate Division affirmed the trial court's rulings concerning the claims on which plaintiffs succeeded.

██ We next consider the dollar amount of the award. Plaintiffs contend that they should recover approximately $2 million. Plaintiffs argue that Amster engaged in intentional misconduct and self-dealing and, therefore, should be required to pay the full amount of the fees as a form of punishment and to deter others from behaving similarly. The trial court disagreed. As noted, in making the $80,000 award the trial court valued plaintiffs' litigation successes at $235,000. The court then determined that one-third of that amount was an appropriate fee award, representing "a reasonable relationship to the amount that was recovered."

██ The $2 million requested by plaintiffs represents the lodestar amount. The lodestar calculation is defined as the number of hours reasonably expended by the attorney, multiplied by a reasonable hourly rate. *Rendine v. Pantzer, supra,* 141 *N.J.* at 316, 661 *A.*2d 1202. Courts regularly employ that method of calculation in assessing fee awards in civil-rights and discrimination cases. *Id.* at 333–45, 661 *A.*2d 1202. New Jersey courts have utilized the lodestar amount in determining reasonable counsel fees in numerous other settings. *See, e.g., Yueh v. Yueh,* 329 *N.J.Super.* 447, 748 *A.*2d 150 (App.Div.2000) (matrimonial action); *Silva v. Autos of Amboy, Inc.,* 267 *N.J.Super.* 546, 632 *A.*2d 291 (App.Div.1993) (action involving Consumer Fraud Act); *Chattin v. Cape May Greene, Inc.,* 243 *N.J.Super.* 590, 581 *A.*2d 91 (App.Div. 1990) (same), *aff'd,* 124 *N.J.* 520, 591 *A.*2d 943 (1991); *In re Estate of Reisen,* 313 *N.J.Super.* 623, 713 *A.*2d 576 (Ch.Div.1998) (probate action).

██ In addition to the lodestar amount, courts consider other factors in evaluating a fee application. In cases like this

one, in which plaintiffs seek fees for legal services far in excess of the value of the benefits obtained, the trial court should consider the damages sought and the damages actually recovered. *Szczepanski v. Newcomb Med. Ctr., Inc.*, 141 *N.J.* 346, 661 *A.*2d 1232 (1995). Further, courts should also take into account "the interest to be vindicated in the context of the statutory [or policy] objectives, as well as any circumstances incidental to the litigation that directly or indirectly affected the extent of counsel's efforts." *Id.* at 366–67, 661 *A.*2d 1232. If the trial court concludes that the hours expended by counsel "exceed those that competent counsel would have expended to achieve a comparable result, a trial court may exercise its discretion to exclude excessive hours from the lodestar calculation." *Rendine v. Pantzer, supra,* 141 *N.J.* at 336, 661 *A.*2d 1202.

We have also instructed trial courts to "reduce the lodestar fee if the level of success achieved in the litigation is limited as compared to the relief sought." *Ibid.* In cases in which counsel fees are based on interrelated claims that were made in good faith, the basic lodestar amount may be an excessive amount if only a partial or limited success is the result. *Ibid.* Moreover, in *North Bergen Rex Transport, Inc.,* we explained that

[a]lthough we do not establish a *per se* requirement that there be a close relationship between recovery and fees awarded for services rendered, we believe that when a substantial portion of a claim sought is ultimately rejected, that circumstance should be considered along with other factors ... to determine a reasonable award of attorneys' fees.

[*North Bergen Transp., Inc., supra,* 158 *N.J.* at 573–74, 730 *A.*2d 843 (footnote omitted).]

With those principles in mind, we are satisfied that the trial court did not abuse its discretion in evaluating plaintiffs' fee application. The trial court rejected a substantial portion of plaintiffs' claims, thereby justifying the reduction in the amount of fees originally sought. In addition, the trial court carefully considered the fee requested by plaintiffs, scrutinized the value of the services that plaintiffs' counsel provided, and evaluated the disparity between the relief initially requested by plaintiffs and that

which was ultimately awarded. Because the trial court was in the best position to weigh the equities and arguments of the parties in this lengthy and contentious case, we shall not disturb its award.

## V.

The judgment of the Appellate Division in respect of plaintiffs' counsel fee award is reversed. In respect of all other issues, the judgment of the Appellate Division is affirmed.

*For reversal in part/affirmance in part*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—none.