**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3446-18T3

BONNIE GLOGOVER,

    Plaintiff-Appellant

v.

HUDSON HARBOUR
CONDOMINIUM ASSOCIATION,
INC. and CUTOLO BARROS, LLC,

    Defendants-Respondents

_____

Argued telephonically September 15, 2020 –
Decided September 29, 2020

Before Judges Haas and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000320-17.

Scott B. Piekarsky argued the cause for appellant (Phillips Nizer LLP, attorneys; Scott B. Piekarsky, of counsel; Ernest W. Schoellkopff, on the briefs).

Christian M. Scheuerman argued the cause for respondent Hudson Harbour Condominium Association, Inc. (Marks, O'Neill, O'Brien, Doherty &

Kelly, PC, attorneys; Christian M. Scheuerman, on the brief).

Gregg S. Sodini argued the cause for pro se respondent Cutolo Barros, LLC.

PER CURIAM

This appeal arises out of a dispute between plaintiff Bonnie Glogover, a unit owner at the Hudson Harbour condominium building in Edgewater, and defendants Hudson Harbour Condominium Association, Inc. (Association) and its law firm, Cutolo Barros, LLC (Cutolo), after Cutolo attempted to collect unpaid monthly charges for cable television service from plaintiff on behalf of the Association.

After participating in an alternative dispute resolution (ADR) procedure provided by the Association's by-laws, plaintiff initiated an action in the Chancery Division claiming that the Association's collection efforts breached a prior settlement agreement and violated the Condominium Act, N.J.S.A. 46:8-1 to -38. Plaintiff further claimed that she was defamed, suffered adverse health effects, and was denied credit. Finally, plaintiff alleged Cutolo's actions violated the Fair Debt Collections Practices Act (FDCPA), 15 U.S.C. § 1692-1692p.

A-3446-18T3

In a November 28, 2018 order, the trial court granted summary judgment to the Association and Cutolo and dismissed plaintiff's claims. In a separate March 26, 2019 order, it also awarded the Association $32,249.81 in attorneys' fees and costs. After carefully reviewing the record and considering the applicable legal principles, we affirm the November 28, 2018 order but vacate the March 26, 2019 order in part and remand for further proceedings.

I.

Plaintiff owns a condominium at Hudson Harbour and has resided there for nearly thirty years. The master deed defines common expenses as "all costs and expenses to be incurred generally by the [u]nit [o]wners pursuant to this [m]aster [d]eed and/or the [b]y-laws in connection with . . . the . . . operation of, and any alteration, addition, or improvement to, the [c]ommon [e]lements . . . [and] the conduct of the affairs of the [c]ondominium." The master deed further provides that the common elements include "all central and appurtenant installations and facilities for services such as . . . telephone [and] cable television." Moreover, under the Association's by-laws, the Board had the power to "employ or contract for water and sewer, electricity and gas, or other forms of utilities, cable, or master antenna television."

A-3446-18T3

On September 1, 2009, the Association entered into a contract (2009 Agreement) with Time Warner Cable (TWC) to supply cable television service to all units in the building at a reduced rate of $42.88 per unit per month, which would "remain in full force and effect for three . . . year[s]." After informing all residents that they would be charged accordingly, plaintiff disputed the expense claiming she did not utilize the service. To resolve the dispute, the Association agreed in a June 15, 2010 confidential settlement agreement (CSA) that plaintiff would "not be liable for any cable television charges for the entire term of the [2009 Agreement] if she chooses not to utilize same."

The Association and TWC subsequently entered into a December 1, 2011 agreement to provide cable television services to all units in defendant's building for $45.77 per unit (2011 Agreement). The 2011 Agreement remained in effect for four years and further provided that it "contains the entire understanding and agreement between the parties . . . and supersedes any prior agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the parties."

Finally, the Association and TWC entered into a November 1, 2014 service and marketing agreement (2014 Agreement) whereby TWC agreed to provide residents with cable television, high-speed internet, and phone service.

A-3446-18T3

The 2014 Agreement contained a similar provision as the 2011 Agreement stating that "[t]his Agreement constitutes the entire agreement between [the Association] and [TWC] with respect to, and supersedes all other agreements relating to, the subject matter contained herein." The 2014 Agreement expired after five years and continued in effect for successive one-year periods, unless either party notified the other that it sought to terminate the 2014 Agreement.

Prior to the Association's collection efforts, it passed a March 4, 2014 resolution that declared parking a privilege and stated that "[i]f a [u]nit [o]wner is delinquent in the payment of any assessment to the Association for more than [sixty] days . . . [they] shall have their parking privileges revoked." Similarly, the resolution provided that if a unit owner was "delinquent in the payment of any assessment to the Association for more than [sixty] days . . . [they] shall have their rights to use and enjoy the common elements suspended, including the right to use the gym, pool, cable, and other non-essential [c]ondominium amenities such as the concierge with regard to deliveries at the front desk."

Nearly two years after the Association passed the resolution, Cutolo informed plaintiff in a February 1, 2016 letter that she owed the Association $371.48 as a result of her failure to remit payment for her monthly cable bill. Cutolo instructed plaintiff that the Association could "suspend [her] services

including but not limited to cable services and parking privileges" in the event payment was not received.

The correspondence also informed plaintiff of her "opportunity for [ADR] in the event [she] dispute[d] this debt and request[ed] ADR in writing." This was consistent with the Association's by-laws which stated that an ADR Committee had the "right to resolve disputes" that arose under and to enforce the rules and regulations of the Association. The by-laws further stated that "any [o]wner who is aggrieved by any decision of the ADR Committee shall have the right to appeal such decision to a court of competent jurisdiction" but "[i]f there is not an appeal . . . within forty-five . . . days of the decision by the ADR Committee, the decision of the ADR Committee shall be binding on all parties and shall have full force and effect under the laws of the State of New Jersey."

Plaintiff disputed the debt and Cutolo responded in a February 9, 2016 letter verifying the amount owed with a ledger outlining the specific charges "represent[ing] [her] pro-rata contribution for cable services obtained by the Association." Having failed to receive any payment from plaintiff, Cutolo filed a lien against plaintiff's unit for the unpaid assessments, interest, attorneys' fees,

and costs, which was recorded in the Bergen County Clerk's Office on December 9, 2016.

The parties, with the assistance of counsel, thereafter voluntarily participated in an ADR proceeding. The ADR Committee concluded that plaintiff was required to pay all future cable bills starting on July 1, 2017 but relieved plaintiff of any liability for past fines and penalties associated with the cable television dispute.

The Association sent plaintiff's counsel notice of the ADR Committee decision in a letter dated June 16, 2017 and, although it informed plaintiff that it did not believe the ADR decision "was . . . consistent with the law of the State of New Jersey," it nevertheless advised plaintiff that it would accept the decision. Plaintiff's counsel, however, advised the Association in an August 1, 2017 email that plaintiff categorically "rejected the ADR decision."

Approximately six months after the ADR decision, plaintiff filed a two-count verified complaint against the Association and Cutolo. In her first count, plaintiff principally alleged that the Association breached the terms of the CSA by "assessing improper, unagreed to and unauthorized charges" and "engag[ing] in a course of draconian punishment upon [her] in the utmost unlawful fashion."

Plaintiff also claimed that the Association improperly placed a lien on her unit without providing her a copy as required by N.J.S.A. 46:8B-21, as well as "suspend[ing] all rights and privileges of ownership" not limited to use of her "parking spot . . . the pool, tennis court, gym, doorman services, washers/dryers, denial of guest parking," and rejecting mail that did not fit in her mailbox. Her second count alleged that Cutolo violated the FDCPA by using "unfair practices as detailed and unfair and unconscionable means to collect or attempt to collect the alleged debt and attempting to collect any amount not authorized by the agreement creating the debt or permitted by law."

Defendants filed a timely answer and counterclaim, in which they sought a judgment "declaring the ADR decision binding . . . [and] for any and all unpaid amounts together with attorney's fees and costs." Defendants further alleged that plaintiff was utilizing her unit "for commercial purposes" and sought to enjoin plaintiff from such unauthorized uses.

After hearing oral arguments, the trial court entered a December 20, 2017 order temporarily restraining defendants from "[p]reventing [p]laintiff from utilizing her parking space" and from "[p]reventing [p]laintiff from use of doorman services, package delivery, washer and dryer use and all other rights and privileges." In a January 25, 2018 order, the court further directed plaintiff

to deposit $3246.66 into escrow "representing outstanding cable charges, without prejudice to plaintiff's claim that the charges are not proper."

Defendants thereafter moved for summary judgment which the court granted in a November 28, 2018 order that dismissed plaintiff's claims but denied the motion as to defendants' counterclaim. In the court's accompanying comprehensive written opinion, it concluded that the CSA only relieved plaintiff from paying cable fees related to the 2009 Agreement. The court reasoned that "the plain language of the CSA refers to the [2009 Agreement], which the parties themselves understood had an expiration date of September 2012." It further emphasized that "[i]f the parties intended the CSA to extend beyond the term of the [2009 Agreement], they could have easily referred to the [2009 Agreement] and all renewals or extensions thereof," which the parties did not do.

The court also determined that "the ADR decision [was] binding on both [p]laintiff and the Association and there [was] no basis on which the court should overturn the ADR decision." In this regard, the court noted that according to the Association's by-laws, any party dissatisfied with the ADR decision was required to file an appeal within forty-five days, but plaintiff "filed the verified complaint on December 14, 2017, almost six . . . months after the ADR decision was provided to her."

Regarding plaintiff's FDCPA claim, the court found that there was "a debt owed to the Association based on the ADR decision" and that Cutolo had "the right to collect that debt because it is a valid debt." As to her claims of harassment as violations of the FDCPA, the court noted that plaintiff "did not provide specificity to her claims . . . that would lead the court to believe there have been violations of the FDCPA" and "sending several letters and filing a lien against [plaintiff's] [u]nit is not an unusual course of action in attempting to collect a debt."

After entry of the court's November 28, 2018 order, all parties consented to dismiss defendants' remaining allegation that plaintiff was utilizing her unit for commercial purposes. Soon thereafter, defendants filed an application for $62,065 in attorneys' fees[1] and $2278.31 in costs.

In a detailed and comprehensive March 26, 2019 written opinion, the court partially granted the Association's fee request. The court reviewed the legal invoices and counsel's certification and concluded that although the "rates

---

[1] The $62,065 sum was comprised of $57,065 in attorneys' fees related to Cutolo's efforts and a $5000 self-insured retention (SIR) paid by the Association to its liability insurer in accordance with the terms of the Association's insurance policy. The Association also appended to its fee application invoices from the Law Office of Steven J. Tegrar (Tegrar), the Association's appointed insurance counsel, in the amount of $21,431. The Association, however, sought reimbursement of only the $5000 SIR related to the Tegrar invoices.

charged by each of [Cutolo]'s professionals [were] reasonable and consistent with prevailing market rates," there were "a number of entries for the [c]ollection [f]ees and the [l]itigation [f]ees that are duplicative and/or administrative [related] which should not be awarded" and accordingly reduced the fee request by $4948.

The trial court next found that because Cutolo "represented . . . itself in connection with [p]laintiff's claims regarding [Cutolo]'s alleged violations of the FDCPA" and there was "no basis to allow [Cutolo] to seek to collect legal fees in connection with [p]laintiff's FDCPA claims," it further reduced the award by $1588. The court also reduced the fee request by an additional $5591, to reflect those Cutolo fees duplicative of work performed by the Tegrar firm.

The court further explained that "all the factors of [RPC] 1.5(a) were considered by the court," and it gave "significant consideration to the amounts and issues involved and the results obtained by counsel for the Association." The court emphasized that the claims involved were not limited to plaintiff's personal circumstances but "implicated the potential ability of any member of the Association to refrain from paying required monthly maintenance and similar charges," which "could have caused havoc to the Association and its ability to maintain/run the condominiums." The court therefore concluded that

the lodestar should be further reduced by 50% from $49,943 to $24,971.50. It also awarded $2278.31 for costs incurred, and the $5000 for the insurance deductible paid by the Association for its insurance defense counsel for a total of $32,249.81. This appeal followed.

## II.

### A.

Plaintiff argues that the ADR Committee's decision "was not controlling" and that the trial court "wrongly decided that the decision of the [Association's] ADR [C]ommittee[] was binding on the parties." She specifically contends that: (1) the ADR procedures "[did] not comport with the mandate of N.J.S.A. 46:8b-14(k) for a fair and efficient procedure for the resolution of housing-related disputes," (2) the ADR Committee decision was not "within the authority conferred by the governing documents and the applicable law," and (3) she never "assented" to ADR or had "full knowledge of her legal rights." We reject all of these arguments.

Section 14(k) of the Condominium Act provides in pertinent part that a "[condominium] association shall provide a fair and efficient procedure for the resolution of housing-related disputes between individual unit owners and the association, and between unit owners, which shall be readily available as an

alternative to litigation." N.J.S.A. 46:8B-14(k). We have held that so long as a dispute "arise[s] from the parties' condominium relationship," a party may, pursuant to N.J.S.A. 46:8B-14(k), demand submission of such disputes to ADR in lieu of proceeding in court. Bell Tower Condo. Ass'n v. Haffert, 423 N.J. Super. 507, 517-18 (App. Div. 2012). Here, the cable bill dispute is inextricably linked to the parties' relationship as condominium association and unit owner. As such, N.J.S.A. 46:8B-14(k) was applicable and the dispute was properly resolved by the ADR Committee.

We also find no support to plaintiff's claim that the ADR process was unfair or inefficient because it imposed a limited period for judicial review or for any other reason. The ADR Committee's ability to hear the dispute was specifically prescribed by the Association's governing documents. Indeed, plaintiff had appropriate notice that she had forty-five days from June 16, 2017 to seek judicial review before the decision became binding. We find nothing unfair or inequitable by the forty-five-day period specified in the by-laws to seek judicial review of the ADR Committee's decision, which is consistent with a party's right to seek appellate review of final orders. See R. 2:4-1. We also reject plaintiff's claim that she did not knowingly assent to the ADR process as she voluntarily participated in that process, with the assistance of counsel.

A-3446-18T3

B.

Plaintiff also argues that the trial court committed error in narrowly interpreting the parties' CSA. Specifically, plaintiff contends that the CSA applied to all cable fees because the 2011 Agreement "extend[ed] the term of the [2009 Agreement] for an additional four years" and the 2014 Agreement "extended the cable contract for five years." Furthermore, plaintiff argues that the Association is estopped from collecting the cable fees due to the four-year delay in seeking reimbursement. We disagree.

The construction of a contract is a question of law. Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011). Consequently, we review the trial court's interpretation of a contract de novo. Id. at 222. Furthermore, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

When construing a contract, our objective is to determine the intent of the parties. Kieffer, 205 N.J. at 223. Generally, we give the terms of a contract their plain and ordinary meaning. Ibid. The court should not make for the parties a different or better contract than they have made for themselves. Ibid.

As the trial court properly determined, the CSA is clear and unambiguous, and plaintiff's contention that the 2011 and 2014 Agreements extended the terms of the 2009 Agreement are belied by the plain language of those contracts. The CSA clearly states that plaintiff would not be liable for cable television charges "for the entire term of the [c]able [c]ontract" which was "set to expire on or around September 2012." The 2011 Agreement makes no specific reference to the 2009 Agreement but states that it "supersedes any prior agreements . . . whether written or oral, between the parties." Similarly, the 2014 Agreement stated that it "supersedes all other agreements relating to[] the subject matter contained herein." We find no support in the record for plaintiff's argument that the Association and TWC intended for the 2011 and 2014 Agreements to be extensions of the 2009 Agreement or that the CSA addressed the cable fees encompassed by those later agreements.

We further disagree with plaintiff's argument that the court "failed to consider the estoppel effect of [the Association's] conduct" and that the Association "engaged in inexcusable and unexplained delay in exercising [its] asserted right to the prejudice of [plaintiff], so as to invoke the doctrine of laches." The by-laws clearly indicate that the Association's failure to enforce a provision does not constitute a waiver of the Association's future right to enforce

stating that "[n]o restriction, condition, obligation, or covenant contained in these [b]y-[l]aws shall be deemed to have been abrogated or waived by reason of the failure to enforce same irrespective of the number of violations or breaches thereof which may occur." Thus, simply because the Association did not seek payment for cable expenses due in 2012 until 2016 is not dispositive, as the Association never waived its right to enforce collection of the debt.

C.

Plaintiff also maintains that "[t]he summary judgment dismissing [plaintiff's] claims . . . arising from [the Association's] wrongful assessment of cable television service charges, was unwarranted on the facts of record, and contrary to law and principles of equity." Plaintiff further argues that the court "overlooked genuine issues of material fact pertinent to [the Association's] attempts to collect cable service charges from [plaintiff] . . . and the harm to [plaintiff] from the [Association's] retaliatory actions in the wake of her legitimate challenge to the charges." We are not persuaded.

We review a summary judgment order de novo by the same standard governing the motion judge's determination. RSI Bank v. Providence Mut. Fire. Ins. Co., 234 N.J. 459, 472 (2018). "By that standard, summary judgment should be granted 'when the pleadings, depositions, answers to interrogatories and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995)); see also R. 4:46-2(c).

As noted, the trial court properly determined that the scope of the CSA was limited to the 2009 Agreement and there is no evidence in the record to indicate that either the Association or TWC intended that their subsequent agreements acted as extensions of that contract. Consequently, the CSA did not prevent the Association from collecting cable fees related to the 2011 and 2014 Agreements from plaintiff.

Furthermore, the by-laws authorized the Association "to enforce the terms of this instrument or any [r]ule or [r]egulation promulgated pursuant thereto, by . . . self-help." As noted, by resolution, the Association declared parking a privilege and stated that any owner who was delinquent for more than sixty days for any assessments "shall have their parking privileges revoked." Similarly, that resolution provided that owners delinquent in payments to the Association "shall have their rights to use and enjoy the common elements suspended, including the right to use the gym, pool, cable, and other non-essential

[c]ondominium amenities such as the concierge with regard to deliveries at the front desk." Thus, the Association was within its power to withhold plaintiff's rights to use all of the common areas and shared services as a result of her failure to pay her portion of the cable expenses after the CSA expired.

Here, in light of the clear and unambiguous language in the CSA, as well as the resolution authorizing self-help remedies by the Association in the event of delinquent payments by unit owners, we disagree with any characterization that the Association breached a fiduciary duty to plaintiff. As noted, the Association was well within its rights to hold plaintiff responsible for cable charges after September 2012 and, pursuant to the by-laws, suspend her parking privileges and access to the common areas. We accordingly concur with the trial court that plaintiff was not entitled to any form of damages, emotional distress, or otherwise.

D.

Plaintiff next contends that she "was entitled . . . to pursue her claims against [Cutolo] under the [FDCPA] for attempting to collect a debt that was not authorized" as Cutolo "was well aware of her position that the debt was invalid in light of the settlement agreement and the applicable law" but nonetheless persisted in "fil[ing] an assessment lien while the opportunity for ADR was yet

open to resolve the issue."  She argues that "because the alleged debt was not contractually and legally authorized, [Cutolo]'s course of action also was unlawful."  Again, we disagree.

Here, as previously discussed, a valid debt existed at the conclusion of the 2009 Agreement.  Cutolo did not send the first demand letter to plaintiff until February 2016, well after the 2009 Agreement's expiration date of September 2012.  As such, the debt it attempted to collect was properly owed to the Association.  And, even though plaintiff disputed the charges after receiving the February 1, 2016 demand letter, Cutolo provided verification of the debt in a timely February 9, 2016 response before it recorded the December 9, 2016 assessment lien against plaintiff.  We find no support in the record that Cutolo harassed, oppressed, or abused plaintiff, 15 U.S.C. § 1692d, or used unfair or unconscionable means to collect their debt, 15 U.S.C. § 1692f.  Accordingly, the trial court properly dismissed plaintiff's FDCPA claims against Cutolo.

E.

Plaintiff also asserts for the first time on appeal that because cable television service is not a common element under the Association's governing documents or the Condominium Act, the Association accordingly had no right to collect those fees.  Again, we disagree.

A-3446-18T3

It is improper to raise an argument for the first time on appeal. "[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised go to the jurisdiction of the trial court or concern matters of great public interest." Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (internal quotation marks omitted); see also R. 2:6-2. Further, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court." R. 2:10-2.

As detailed in the court's November 28, 2018 written decision, plaintiff challenged the Association's ability to collect the outstanding cable fees on two discrete grounds: 1) that the 2009 Agreement did not expire in 2012 but was instead extended by the 2011 and 2014 Agreements; and 2) she rejected the ADR decision and was not precluded from challenging it despite her failure to comply with the forty-five-day deadline. Plaintiff did not contend that the cable charges were not authorized by the Condominium Act or the Association's governing documents as she does on appeal. As plaintiff failed to raise these arguments before the trial court, and the issue addresses neither the court's jurisdiction nor

involves a matter of great public interest, we customarily decline to consider them for the first time on appeal.

We also reject as unsupported by the record plaintiff's claim that these arguments were preserved as they were "generally the same issues presented before the trial court" and merely asserted the same relief under a different theory. Plaintiff's appellate arguments challenging the propriety of the Association from charging cable fees are distinct from those raised in the trial court. For purposes of completeness, however, we address and reject plaintiff's claims on the merits.

Both the Association's governing documents and the Condominium Act permit the Association to charge all unit owners for cable television costs as common expenses. As noted, the Association's master deed, defines common expenses to include "all costs and expenses to be incurred generally by the [u]nit [o]wners pursuant to this [m]aster [d]eed and/or the [b]y-[l]aws in connection with . . . (iv) the conduct of the affairs of the [Association]." Furthermore, the by-laws empower the Association's board of directors to "contract for . . . cable." Providing funding for an authorized contract is clearly an expense related to the "conduct of the affairs of the [Association]."

Similarly, the Condominium Act defines common expenses to include:

expenses for which the unit owners are proportionately liable, including but not limited to: (i) all expenses of administration, maintenance, repair, and replacement of the common elements; (ii) expenses agreed upon as common by all unit owners; and (iii) expenses declared common by provisions of this act or by the master deed or by the bylaws.

[N.J.S.A. 46:8B-3(e).]

The Condominium Act also states an association "shall be responsible for the performance of [its] duties" including "[t]he assessment and collection of funds for common expenses and the payment thereof." N.J.S.A. 46:8B-14(b). "The association may levy and collect assessments duly made by the association for a share of common expenses or otherwise, . . . together with interest thereon, late fees and reasonable attorney's fees, if authorized by the master deed or bylaws." N.J.S.A. 46:8B-15(e).

Further, "[a] unit owner shall, by acceptance of title, be conclusively presumed to have agreed to pay his proportionate share of common expenses accruing while he is the owner of a unit." N.J.S.A. 46:8B-17. "No unit owner may exempt himself from liability for his share of common expenses by waiver of the enjoyment of the right to use any of the common elements or by abandonment of his unit or otherwise." Id. "The obligation to pay condominium

fees has been described as 'unconditional.'" Glen v. June, 344 N.J. Super. 371, 376 (App. Div. 2001).

The 2011 and 2014 Agreements create an expense to be incurred by all unit owners which was authorized pursuant to the Association's powers under its by-laws. When plaintiff purchased her unit, she agreed to be bound by the aforementioned governing documents, which permitted the Association to enter contracts for cable services and are therefore included as common expenses as defined in the master deed. To hold otherwise would permit plaintiff to selectively pay authorized contractual expenses, contrary to the terms of the governing documents and the interests of other unit owners.

III.

Finally, plaintiff maintains that, although the Association is entitled to recover reasonable attorneys' fees related to its collection efforts, "[the governing documents] do not permit fee-shifting, for [the Association's] benefit, on a unit owner's judicial challenge to the [Association's] assessment as beyond its authority and in contravention of a previous settlement agreement." She further argues that the attorneys' fee award should be reversed because the trial court "cited the factors contained in [RPC] 1.5(a) and the general case law to be considered in assessing the reasonableness of the attorneys' fee but did not

23                                                    A-3446-18T3

expressly apply any of those factors to the circumstances presented" as required by Rule 1:7-4. Finally, plaintiff argues that "[t]he award of over half of [the Association's] demand amounted to more than [thirty-five] times the $900 amount paid to [the Association]," which was "unreasonable and contrary to law." We disagree with the majority of plaintiff's arguments and remand only for the court to address two limited issues associated with the fee award.

"[F]ee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." Rendine v. Pantzer, 141 N.J. 292, 317 (1995). We award attorney's fees only where "expressly provided for by statute, court rule, or contract." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 385 (2009) (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 440 (2001)).

The first step in determining the fee award is calculating the "lodestar," which is a reasonable hourly rate for counsel's services multiplied by the number of hours reasonably expended. Walker v. Giuffre, 209 N.J. 124, 130-31 (2012). Additionally, Rule 4:42-9(b) requires counsel to submit "an affidavit of services addressing the factors enumerated by RPC 1.5(a)," as well as "a recitation of other factors pertinent in the evaluation of the services rendered."

If the court determines that the hours expended "'exceed those that competent counsel would have expended to achieve a comparable result, a trial court may exercise its discretion to exclude excessive hours from the lodestar calculation.'" Packard-Bamberger, 167 N.J. at 446 (quoting Rendine, 141 N.J. at 336). When the fee request "far exceeds the damages recovered, 'the trial court should consider the damages sought and the damages actually recovered.'" Litton, 200 N.J. at 387. Indeed, when the damages are disproportionately less than the fees sought, "the court must consider that fact in determining the overall reasonableness of the attorney's fee award." Id. at 387-88. Ultimately, the "goal is to approve a reasonable attorney's fee that is not excessive." Id. at 388.

Strict proportionality is not a requirement in statutory fee-shifting; rather, proportionality is one relevant factor to be considered as to the overall reasonableness of the fee. See Walker, 209 N.J. at 132; Szczepanski v. Newcomb Med. Ctr., 141 N.J. 346, 366 (1995) (rejecting strict proportionality for fee-shifting statutes as the public interest is served by successful prosecution, and the awards "assure that counsel for [plaintiffs] will receive reasonable compensation for services reasonably rendered to effectuate the [statute's] objectives").

25

We agree with the court's conclusion that plaintiff was responsible for a portion of the Association's attorneys' fees. The Association's governing documents authorized the recovery of attorneys' fees if a unit owner failed to timely pay monthly association fees. Further, the Condominium Act authorizes a condominium association to charge a non-paying member with reasonable attorney's fees. N.J.S.A. 46:8B-21.

We also concur with the court's determination that fees related to Cutolo's defense of plaintiff's FDCPA claims were not recoverable under the aforementioned governing documents or the Condominium Act and further because Cutolo was acting pro se in its own defense. Finally, we conclude the court's determination to reduce the fees by $12,122 as duplicative and unnecessary was fully supported by the record.

We are also convinced that the court did not abuse its discretion in finding that plaintiff's counsel's hours and rates were reasonable under Rule 4:42-9(b) and Rendine, 141 N.J. at 334-38. The judge thoroughly analyzed counsel's affidavit of services and properly determined that the recoverable fees were reasonable and warranted under the circumstances and made appropriate reductions as necessary. Nothing in the record demonstrates that plaintiff's counsel's hours, after the court's reductions, "exceed[ed] those that competent

counsel reasonably would have expended to achieve a comparable result," Rendine, 141 N.J. at 336, particularly in light of plaintiff's claims and her aggressive litigation posture.

Further, the court expressly considered that the fee award was greater than the damages, as required by Packard-Bamberger, 167 N.J. at 446, and, nonetheless, determined that the fee award was reasonable. The court found that strict proportionality was not required because plaintiff's claims "implicated the potential ability of any member of the Association to refrain from paying required monthly maintenance and similar charges." The court also reasoned that plaintiff's position had the potential to cause "havoc to the Association and its ability to maintain [and] run the condominium[]." The court clearly considered plaintiff's limited success, halved the lodestar before concluding that a $24,971.50 fee was a reasonable fee. Based on our review of the record, we find no abuse of the court's discretion to warrant interference with the court's decision. See Packard-Bamberger, 167 N.J. at 444.

We have identified two issues with respect to the fee award, however, that require vacating the March 26, 2019 order and remanding for further proceedings. First, it appears that the court considered the $5000 SIR twice. Indeed, when the court considered the gross fee award of $62,065, it included

the $57,065 fees requested by Cutolo plus the SIR. After considering Cutolo's invoices and reducing the fees by $12,122, the court halved the $49,943 lodestar to the $24,971.50 reduced fee award and then added $2278.31 in costs, along with, again, the $5000 SIR. On remand, the SIR should be considered only once when computing the appropriate fee award.

Second, the Cutolo invoices included a nominal fee for the services of a paraprofessional. The certification supporting these expenses, however, failed to include the required explanation as to the paralegal's "qualifications, and the attorney's billing rate for paraprofessional services to clients generally," as required by Rule 4:42-9(b). Instead, counsel merely attested that the paralegal was formerly associated with the firm and billed at a $110 hourly rate. To the extent the Association seeks reimbursement of any paraprofessional's fees, an appropriate certification should be submitted to the trial court on remand.

## IV.

In sum, we affirm the trial court's November 28, 2018 order granting summary judgment to defendants and dismissing plaintiff's complaint. We vacate the trial court's March 26, 2019 order and remand for the court to address the two limited issues addressed in our opinion associated with its fee award.

A-3446-18T3

To the extent we have not addressed any of the parties' arguments it is because we find them without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3446-18T3